**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION,
Defendant.**

**No. 69 Civ. 200 (DNE).**

United States District Court,
S. D. New York.

June 25, 1979.

U. S. Dept. of Justice, Antitrust Div., for plaintiff United States.

Cravath, Swaine & Moore, New York City, for defendant Intern. Business Machines Corp.

## MEMORANDUM AND ORDER

EDELSTEIN, Chief Judge.

On February 7, 1979, the United States of America ["government"], plaintiff in this civil antitrust action, served a deposition subpoena ad testificandum and duces tecum, Fed.R.Civ.P. 45(d), upon Frank T. Cary ["Cary"], Chairman of the Board of defendant International Business Machines Corporation ["IBM"], commanding Cary to appear for a deposition and to produce documents described in fifty-three separate paragraphs and subparagraphs of a schedule attached to the subpoena.[1] Cary has been named by defendant as one of its witnesses, and the subpoena issued as part of a court-authorized deposition program allowing plaintiff to depose defendant's prospective trial witnesses.[2] The limited purpose of that program is to enable plaintiff to prepare for cross-examination at tri-

---

1. The schedule of documents to be produced is appended to this memorandum and order.

2. *See* orders of this court dated July 28, 1977; April 25, 1978; June 7, 1978.

al of defendant's witnesses.[3] Defendant is now presenting its direct case.

### IBM's and Cary's Motion to Quash

IBM and Cary have moved this court to quash the duces tecum part of the subpoena pursuant to rule 45(b) of the Federal Rules of Civil Procedure and the fourth amendment to the United States Constitution. The arguments presented are numerous, interrelated, often repetitive and rhetorical. In the first instance, IBM and Cary assert that the subpoena is "unreasonable and oppressive," Fed.R.Civ.P. 45(b), under every test of reasonableness articulated by courts. If reasonableness is measured in terms of the burden imposed, IBM and Cary conclude "[w]e have found no case which even remotely compares—in terms of time, manpower or cost—to the burden to be visited upon IBM by plaintiff's subpoena."[4] Lead counsel for IBM states that "[r]ealistically, it is not possible for IBM to produce all of the documents called for by the Cary subpoena . . . ." *Affidavit of Thomas D. Barr*, dated March 14, 1979 at 2.

Apart from the argument of burdensomeness, IBM and Cary object to the sweeping, all-inclusive nature of the government's document request. According to IBM and Cary, that request must be considered in light of substantial discovery already afforded the government.[5] IBM and Cary characterize the subpoena as an improper mid-trial discovery request which, if granted, would severely delay the course of the trial.

IBM and Cary contend further that the subpoena is overly broad in two respects: it asks for too much and fails reasonably to particularize the documents requested. The subpoena is described by IBM and Cary as all-encompassing, "calling at bottom for everything that IBM has." *Memorandum of IBM and Cary* at 22. Document requests contained in the subpoena are said to be vague and redundant so that "[i]t is impossible for IBM—or anyone else—to know which documents to produce in response to which of the overlapping paragraphs of the demand." *Memorandum of IBM and Cary* at 22. Because of the sweeping nature of the subpoena on the one hand, and its lack of specificity on the other, IBM and Cary allege that the subpoena constitutes an unreasonable search and seizure in violation of the fourth amendment.

Other arguments advanced by IBM and Cary, and the court's responses thereto, are set forth in the margin.[6]

---

**3.** *See* memoranda and orders of this court dated Feb. 5, 1979 (memorandum and order compelling document production from a prospective trial witness of defendant); April 25, 1978 (memorandum denying IBM's motion to reopen discovery); July 28, 1977 (memorandum and order authorizing plaintiff to take depositions).

**4.** Memorandum of IBM and Cary, at 10–11. According to IBM and Cary, document pages responsive to the subpoena number in excess of 5 billion and are located in more than 120 countries. Compliance with the subpoena is estimated to require approximately 62,000 man-years of effort and over $1 billion in cost. *Id.* at 1–2.

**5.** Lead counsel for IBM states that "more than 61 million pages of documents responsive to the Cary subpoena" already have been produced in response to previous document requests by the government or have been made available to the government through production made by IBM to private plaintiffs. *Affidavit of Thomas D. Barr,* dated March 14, 1979 at 3. Lead counsel for IBM also notes that Cary has been deposed in this and other actions and that

Cary has testified at length in two other trials regarding "many, indeed most, of the issues raised here." *Affidavit of Thomas D. Barr*, dated March 14, 1979 at 2.

**6.** First, IBM and Cary argue that production of documents responsive to the subpoena which are located in foreign countries may be barred by foreign laws, and that an evidentiary hearing would have to be held to determine the applicability of those laws. However, this is not a ground for quashing the subpoena in its entirety. IBM and Cary have not asked for, and today's decision does not foreclose them from seeking, appropriate protection for specific documents production of which may be barred by foreign law. *See United States v. First National City Bank,* 396 F.2d 897 (2d Cir. 1988); *In re Chase Manhattan Bank,* 297 F.2d 611 (2d Cir. 1962). Second, IBM and Cary object to the instruction in the subpoena requiring production of documents on an ongoing and continuing basis until Cary's trial testimony is completed. This court rejected the identical argument in *United States v. International Business Machines Corp.,* 83 F.R.D. 92

**100**

### The Government's Response

The government opposes IBM's and Cary's motion to quash and responds that it needs the documents requested to prepare for cross-examination of Cary at trial. According to the government, it "has had virtually no discovery of documents from the IBM files relating to Mr. Cary for the period 1974 to the present." *Plaintiff's Memorandum* at 1. Yet, the government asserts, there is every indication that Cary's testimony will focus on the time period 1974 to the present by covering such issues as "future trends in the EDP [Electronic Data Processing] industry," "the future of communications companies in the EDP industry," "foreign competition in the U.S. market," and "current revenue and growth figures" of EDP companies. *Plaintiff's Memorandum* at 7. Without the documents demanded in the subpoena, the government contends, it "would be effectively obstructed in its efforts to confront the Chief Executive Officer of the defendant corporation with any contradictory evidence concerning many contemporary issues to which Mr. Cary will testify . . . ." *Plaintiff's Memorandum* at 7. Moreover, the government disputes IBM's and Cary's contention

that compliance is impossible without delaying the course of the trial.

The government argues further that the reasonableness of the subpoena—in terms of its scope and specificity—must be measured against IBM's "vague representations of the broad potential scope" of Cary's trial testimony. *Plaintiff's Memorandum* at 8. Fundamental fairness, the government concludes, requires that it be allowed to obtain documents relevant to Cary's projected trial testimony.

### The Fourth Amendment

IBM and Cary invoke the fourth amendment's prohibition against unreasonable searches and seizures as an independent ground for quashing the government's subpoena. To support their constitutional attack, IBM and Cary have referred the court to cases imposing a fourth amendment requirement of reasonableness on subpoenas duces tecum issued by grand juries and administrative agencies in the course of their investigations. The court questions the applicability of the fourth amendment to a subpoena duces tecum served by the government in the course of a civil trial.

(S.D.N.Y.1979) (memorandum and order compelling document production from a prospective trial witness of defendant). Third, IBM and Cary contend that the subpoena is an improper attempt to reopen Rule 34 discovery which will impact IBM's ability to present its case-in-chief. The purpose of the government's subpoena is to prepare for cross-examination at trial of Cary and properly within the intent of the deposition program ordered by the court. Finally, IBM and Cary allege that "much" of the information demanded by the subpoena is highly protected and that "much" of this information is being sought by the government in its motion presently *sub judice,* dated January 17, 1979 requesting documents relating to relief. Although there is a potential for abuse or at least confusion when a motion seeks documents already sought by a pending motion before the court, in this instance the potential remains unrealized. As the court understands IBM's argument, the principal objection to the Cary subpoena (as it relates to the motion of January 17, 1979) is that it seeks assertedly confidential materials. It may be said that by enforcing this subpoena without full consideration of the confidentiality claims asserted in IBM's opposition to the January 17, 1979 mo-

tion, IBM will not have been afforded a hearing on that or other defenses made to that motion. However, after submission of both the January 17, 1979 motion and the present motion, this court entered a protective order dated April 17, 1979, designed to afford appropriate protection to IBM's confidential information of the type recognized by rule 26(c)(7), Fed.R.Civ.P., which may be subject to subpoena by the government. Moreover, the protective order expressly provides that it does not affect the right of any person to seek whatever further relief is available under the Federal Rules of Civil Procedure. The existence of this order obviates any claim of prejudice to IBM by the issuance of the Cary subpoena and today's order enforcing it, insofar as confidentiality is concerned. Beyond this, the court agrees with plaintiff's statement that "the same documents may be legitimately sought for two separate and independent purposes." *Plaintiff's Memorandum* at 12. Even if only one such purpose is ultimately validated by the court, production will still be appropriate. Once it is established that plaintiff is entitled to documents in connection with Cary's testimony, the fact that the January 17, 1979 motion is still undecided becomes irrelevant to disposition of the present motion.

■ "[D]ecisions have moved with variant direction" when applying fourth amendment protection to "so-called 'figurative' or 'constructive' " searches conducted pursuant to subpoenas duces tecum. *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 202, 66 S.Ct. 494, 90 L.Ed. 614 (1946). The development of law in this area has been keenly analyzed by Judge Friendly. *In Re Horowitz,* 482 F.2d 72, 75–79 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). No purpose would be served by once again tracing the often tortuous path on which the Supreme Court embarked in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) and *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). It is sufficient to emphasize the present posture of that development. Subpoenas duces tecum issued in the course of investigations by grand juries and administrative agencies are subject to the fourth amendment's prohibition against unreasonable searches and seizures. *See, e. g., United States v. Dionisio,* 410 U.S. 1, 11, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) ("The Fourth Amendment provides protection against a grand jury subpoena *duces tecum* too sweeping in its terms 'to be regarded as reasonable' ", quoting *Hale v. Henkel,* 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906)); *See v. City of Seattle,* 387 U.S. 541, 544, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967) ("It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). The warrant and probable cause requirements of the fourth amendment, however, are not imposed on grand jury or administrative subpoenas duces tecum. *See, e. g., United States v. Dionisio,* 410 U.S. 1, 9, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (grand jury subpoena "not a 'seizure' in the Fourth Amendment sense"); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 195, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (administrative subpoenas duces tecum "present no question of actual search and seizure . . . ."). *Cf.*

*See v. City of Seattle,* 387 U.S. 541, 544–45, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967) (contrasting "actual searches and inspections of commercial premises" with administrative subpoenas duces tecum).

Whether the fourth amendment limits a subpoena served in a civil proceeding is not answered by reference to those cases addressing grand jury and administrative subpoenas duces tecum. The court is aware of only three cases where discovery requests or orders issued in the course of a civil trial were challenged as unreasonable under the fourth amendment. In *General Petroleum Corp. v. District Court,* 213 F.2d 689 (9th Cir. 1954), the court noted but did not deal with petitioner's argument that the trial court's order for production of documents called for an unreasonable search and seizure. The district court in *Rekeweg v. Federal Mutual Insurance Co.,* 27 F.R.D. 431 (N.D.Ind.1961), rejected defendant's constitutional claims made in response to a rule 34 motion for production of documents. "The documents here sought are not to be used in a criminal prosecution . . . nor do they constitute practically all of the records of the corporation . . . ." 27 F.R.D. at 438. Although the court's reasoning is inexplicit, it may be inferred that the court thought defendant's fourth amendment claims appropriately raised and rejected them on the merits. In *United States v. Aluminum Co. of America,* 1 F.R.D. 57 (S.D. N.Y.1939), the district court stated that the subpoena duces tecum sought to be quashed by defendant "would constitute an invasion of the constitutional right of Alcoa to be free from an unreasonable search." 1 F.R.D. at 57–58. While *Alcoa,* and perhaps *Rekeweg,* may be said to stand for the proposition that discovery requests made in the course of a civil trial are subject to fourth amendment reasonableness protection, they contain little or no analysis to support that conclusion. The court finds them unconvincing.

■ In the court's view, the circumstances surrounding an investigative subpoena duces tecum issued by a grand jury or administrative agency are very different from

those present when a subpoena duces tecum is served by the government in the course of a civil proceeding. Grand jury subpoenas seek to uncover criminal wrongdoing, while administrative subpoenas seek to uncover violations of statutes within the agency's regulatory mandate. With respect to these investigative subpoenas the fourth amendment protects against unreasonable "constructive" searches and seizures. However, when the government initiates a civil action it discards its investigative role for that of litigant. When a subpoena duces tecum in a civil case is challenged, it would appear the protection sought resides in the Federal Rules of Civil Procedure, not the fourth amendment.

Moreover, if the fourth amendment applies to a subpoena issued by the government in civil litigation, there may be no escape from the conclusion that in all civil cases, even where the government is not a litigant, the fourth amendment applies to limit discovery requests. The requisite state action component of a fourth amendment claim in all civil cases, whether the government appears or not, would be the court's involvement in issuing and enforcing the subpoena. It strains common sense and constitutional analysis to conclude that the fourth amendment was meant to protect against unreasonable discovery demands made by a private litigant in the course of civil litigation.

■ Other factors, however, can be noted in evaluating whether the fourth amendment's requirement of reasonableness extends to the subpoena served on Cary.[7] The fourth amendment protects reasonable expectations of privacy from governmental intrusion. See Katz v. United States, 389 U.S. 347, 351–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Quaere whether that protection should not remain equally applicable without regard to the particular role played by the government as investigator or litigant. If the government issues a Civil Investigative Demand,[8] that demand may be challenged under the fourth amendment's standard of reasonableness as applied to grand jury subpoenas. 15 U.S.C. § 1312(c)(1) (1976). See Hyster Co. v. United States, 338 F.2d 183 (9th Cir. 1964); In re Columbia Broadcasting System, Inc., 235 F.Supp. 684 (S.D.N.Y.1964).[9] Arguably, to hold that a subpoena duces tecum served by the government in the course of a civil antitrust action may not be similarly challenged would lead to an incongruous result: the timing of the government's document demand determines the

---

7. Leading commentators suggest that the fourth amendment reasonableness rule applies to rules 34 (production of documents) and 45. Professor Moore states: "It seems probable that [rule 45(b)] was intended to provide a procedure for objecting to a command that would constitute an unreasonable search or seizure. . . ." 5A Moore's Federal Practice, § 45.05[1] at 45–27 (1977). Professors Wright and Miller throughout assume that the fourth amendment applies to Rule 34, which of course is similar to Rule 45. For example, they discuss whether the 1948 amendment eliminating the materiality prerequisite for document discovery, or the 1970 amendment, eliminating the good cause prerequisite, violates the fourth amendment. They conclude that these amendments are constitutional, not because the fourth amendment does not apply, but because the civil discovery rules are, on their face, constitutionally "reasonable." C. Wright & A. Miller, Federal Practice and Procedure, § 2202 at 587–89 (1971).

8. A Civil Investigative Demand is a process with analogues to both investigative subpoenas duces tecum and civil discovery procedures.

The Antitrust Civil Process Act empowers the Attorney General or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice to issue, prior to the institution of a civil or criminal proceeding, a demand for documentary material relevant to a civil antitrust investigation. In 1976 Congress extended the reach of the Civil Investigative Demand by adding to that process discovery powers typically available in civil litigation. E. g., 15 U.S.C. §§ 1312(h) (interrogatories), (i) (oral examinations) (1976).

9. The 1976 amendment to the Antitrust Civil Process Act provides that Civil Investigative Demands may also be challenged under the standards applied by the Federal Rules of Civil Procedure to discovery requests if applying such a standard is "appropriate and consistent with the provisions and purposes of this chapter." 15 U.S.C. § 1312(c)(2) (1976). See H.R. Rep.No. 94–1343, 94th Cong., 2d Sess. 9–12, reprinted in [1976] U.S.Code Cong. & Admin. News, pp. 2572, 2603–2606.

applicability of the fourth amendment, even though precisely the same privacy interest is involved in each situation.

Finally, IBM's and Cary's fourth amendment objections cannot be rejected simply because this is a civil antitrust action not involving criminal or administrative sanctions. The Supreme Court has made clear that fourth amendment protection is not restricted to searches and seizures designed to uncover criminal wrongdoing. *See Zurcher v. Stanford Daily,* 436 U.S. 547, 555–56, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (dictum); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (warrantless administrative search of personal residence); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (warrantless administrative search of commercial premises).[10] *See also Nixon v.* *Administrator of General Services,* 408 F.Supp. 321, 361 (D.D.C.1976) (fourth amendment reasonableness test applied to federal statute authorizing Administrator to take custody of former President Nixon's papers), *aff'd,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

■ After much reflection, the court is left in doubt whether the analogical "search and seizure" embodied in a civil discovery subpoena should be susceptible to fourth amendment attack at all. For purposes of deciding this motion, the applicability of the fourth amendment will be assumed rather than decided, for it is clear that the fourth amendment if applicable would hold subpoenas in civil litigation to a standard of reasonableness no more rigorous than that imposed by rule 45(b).[11] Therefore, the rea-

---

10. *Camara* and *See* dealt with criminal prosecutions against persons who had refused access to administrative officials attempting to engage in warrantless searches of their residential and business premises. However, in *Camara* the Court quite explicitly refused to condition applicability of the fourth amendment solely on the possibility of criminal liability premised on the refusal of entry itself or on evidence seized during the search. Emphasizing the privacy interest protected by the fourth amendment, the Court said, "even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority . . . ." 387 U.S. at 530–31, 87 S.Ct. at 1732. The later case, *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), placed much greater emphasis on the possibility of incrimination as a basis for applying the fourth amendment. The case held that home visits by welfare caseworkers were not subject to the warrant and probable cause requirements, at least in part, because refusal of entry at the option of the welfare recipient resulted in cutoff of aid but no criminal penalty. 400 U.S. at 317–18, 91 S.Ct. 381. However, *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), which reaffirmed the state's power to search the property of a person not suspected of criminality pursuant to a valid warrant, stated clearly in dictum that, after *Camara,* applicability of the fourth amendment does not turn on the potentiality of incrimination. 436 U.S. at 555–56, 98 S.Ct. 1970.

11. In terms the two provisions are, of course, coextensive in their proscription of "unreasonable" action, and the cases generally describe the effect of the fourth amendment and rule 45(b) in similar language. *Compare, e. g., Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946) (the "gist of [fourth amendment] protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable") *with, e. g., United States v. E. I. Du Pont De Nemours & Co.,* 14 F.R.D. 341, 343 (N.D.Ill. 1953) ("the test set forth in [rule 45(b)] itself is whether such a request is unreasonable or oppressive"). The court's own review of the cases, note 12 *infra,* also suggests that the various indicia of reasonableness are often similarly applied to the facts of grand jury and administrative subpoenas and document demands in civil litigation. However, in at least one important respect the protection afforded against unreasonable subpoenas by the fourth amendment appears less potent than that available under the Rules in the course of civil litigation. That may be because the fourth amendment claims have generally arisen in the grand jury and administrative areas, where the standard of relevance is held to be less stringent than that imposed to limit civil discovery. In the case of grand jury proceedings, the witness' right to urge relevance objections has not changed appreciably since *Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919), wherein it was said, "[h]e is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his." And in the case of administrative proceedings, the court has spoken in strikingly similar terms:

This case illustrates the difference between the judicial function and the function the [Federal Trade] Commission is attempting to perform. The respondents argue that since

sonableness of the instant subpoena is examined within the single heading below. Moreover, whether reasonableness is analyzed under the fourth amendment or rule 45(b), the burden of persuasion in a motion to quash a subpoena issued in the course of civil litigation is borne by the movant. *See, e. g., Goodman v. United States,* 369 F.2d 166, 169 (9th Cir. 1966); *Westinghouse Electric Corp. v. City of Burlington,* 122 U.S. App.D.C. 65, 69, 351 F.2d 762, 766 (1965); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2457 at 435 (1971).

### Reasonableness of the Subpoena

Encompassed under the rubric of reasonableness are such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.[12] When these elements are balanced and assessed in the context of an individual subpoena, "prior decisions are of limited value."[13] The facts and circumstances of the instant situation control.[14]

### I. Relevance

Rule 45(d)(1), Fed.R.Civ.P., authorizes issuance of a deposition subpoena duces tecum commanding production of materials within the scope of examination authorized by rule 26(b); that is, "any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." This standard of relevance is in accord with the fourth amendment requirement often laid down for judging the reasonableness of administrative and grand jury subpoenas duces tecum, that the documents sought must relate to the purpose of the inquiry.[15] Because the purpose of the

---

the Commission made no charge of violation either of the decree or the statute, it is engaged in a mere "fishing expedition" to see if it can turn up evidence of guilt. We will assume for the argument that this is so. Courts have often disapproved the employment of the judicial process in such an enterprise.

. . . . .

. . . Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise power of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.

*United States v. Morton Salt Co.,* 338 U.S. 632, 641–43, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

12. These factors are distilled from cases that have arisen in the grand jury, administrative, and civil litigation contexts. *See, e. g., Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (administrative subpoena); *Covey Oil Co. v. Continental Oil Co.,* 340 F.2d 993 (10th Cir.) (rule 45 subpoena), *cert. denied,* 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965); *Horizons Titanium Corp. v. Norton Corp.,* 290 F.2d 421 (1st Cir. 1961) (rule 45 subpoena); *In re Rabbinical Seminary Etc.,* 450 F.Supp. 1078 (E.D.N.Y.1978) (grand jury

subpoena); *FTC v. Rockefeller,* 441 F.Supp. 234 (S.D.N.Y.1977) (administrative subpoena), *aff'd,* 591 F.2d 182 (2d Cir. 1979); *Ghandi v. Police Dep't,* 74 F.R.D. 115 (E.D.Mich.1977) (rule 45 subpoena); *SEC v. Kaplan,* 397 F.Supp. 564 (E.D.N.Y.1975) (administrative subpoena); *Democratic Nat'l Comm. v. McCord,* 356 F.Supp. 1394 (D.D.C.1973) (rule 45 subpoena); *United States v. America Optical Co.,* 39 F.R.D. 580 (N.D.Cal.1966) (rule 45 subpoena); *In re Grand Jury Subpoena Duces Tecum,* 203 F.Supp. 575 (S.D.N.Y.1961) (grand jury subpoena); *Austin Theatre, Inc. v. Warner Bros. Pictures, Inc.,* 30 F.R.D. 156 (S.D.N.Y. 1958) (rule 45 subpoena); *Connecticut Mut. Life Ins. Co. v. Shields,* 17 F.R.D. 273 (S.D.N.Y. 1955) (rule 45 subpoena); *United States v. E. I. Du Pont De Nemours & Co.,* 14 F.R.D. 341 (N.D.Ill.1953) (rule 45 subpoena); *In re Radio Corp. of America,* 13 F.R.D. 167 (S.D.N.Y.1952) (grand jury subpoena).

13. *In re Radio Corp. of America,* 13 F.R.D. 167, 171 (S.D.N.Y.1952) (citation omitted).

14. *See, e. g., Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 506, 90 L.Ed. 614 (1946) ("relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry"); *United States v. E. I. Du Pont de Nemours & Co.,* 14 F.R.D. 341, 343 (N.D.Ill.1953); *In re Radio Corp. of America,* 13 F.R.D. 167, 171 (S.D.N.Y.1952).

15. *Compare, e. g., FTC v. Rockefeller,* 441 F.Supp. 234, 240–42 (S.D.N.Y.1977) (administrative subpoena), *aff'd,* 591 F.2d 182 (2d Cir.

government's document request contained in the Cary subpoena is to prepare for cross-examination of Cary at trial, the "focus of the inquiry must be the relevance of the documents sought" to Cary's anticipated trial testimony. *United States v. International Business Machines Corp.,* 83 F.R.D. 92, 95 (S.D.N.Y.1979) (memorandum and order compelling production of documents from prospective trial witness of IBM).[16]

Cary's trial testimony apparently will be exceedingly broad. According to the witness identification form prepared by IBM, the issues to be covered by Cary's testimony are:

> Market Definition; Market Structure and Indicia of Monopoly Power; Intent to Monopolize; Bundling; Educational Allowance; Peripherals; Leasing; IBM's announcements; excellence of IBM's products, services and management; history of electronic data processing; design, development, testing, manufacture, marketing and maintenance of, and demand for, IBM's EDP products and services; IBM's manufacturing excellence; needs of users of EDP products and services; reasons for IBM's success.

IBM counsel has stated, "[b]ear in mind Mr. Cary, in addition to being the Chief Executive Officer of the Company, is going to be giving testimony of very broad scope in this case. He is going to be covering virtually all issues." Transcript (Feb. 8, 1979) at 88,644. Indeed, Cary's projected trial testimony has assumed such breadth and importance that counsel for IBM have represented to the court on numerous occasions that testimony of witnesses subsequent to Cary's trial appearance may be narrowed or eliminated as cumulative.[17]

Given such representations, it is not surprising that plaintiff's document demand is correspondingly broad. Paragraphs 1–9 describe categories of documents regarding Cary's employment history at IBM, his financial interests in the EDP industry as well as his family's, and Cary's involvement in litigation. Paragraph 12 calls for reports of interviews of Cary regarding EDP by any organization. Paragraphs 10 and 11 describe documents within Cary's personal or corporate custody and control, generated since January 1, 1974, relating to 42 particularized subjects in the EDP area or concerning IBM plus "[a]ll documents relating to EDP which were authored by, addressed to, copied to, reviewed by, or relied upon by Frank T. Cary."

The apparent relevance of these documents to the projected scope of Cary's testimony and thus to the "purpose of the inquiry" cannot be controverted on the record before the court. The court's inquiry is necessarily directed to the face of the document demand and to the stated subject

---

1979), *and In re Grand Jury Subpoena Duces Tecum,* 203 F.Supp. 575, 578 (S.D.N.Y.1961) (grand jury subpoena) *with United States v. E. I. Du Pont de Nemours,* 14 F.R.D. 341, 343 (N.D.Ill.1953) (rule 45(b) subpoena).

**16.** That memorandum was occasioned by plaintiff's motion pursuant to rule 45(d)(1) to enforce a subpoena duces tecum served on a prospective witness. Part of the defense to that subpoena was an explicit denial of the relevance of the documents sought. By contrast, the present motion to quash does not explicitly contest the relevance of the documents demanded. Nevertheless, questions of relevance and need bear heavily on any judgment of the reasonableness of the subpoena and thus are given full consideration here.

**17.** *See, e. g.,* Letter of Alan J. Hruska, counsel for defendant, to the court (February 23, 1979) at 3 ("content of Mr. Cary's testimony may significantly affect the scope of, or need for, the testimony of witnesses following him on the list"); Affidavit of Ronald S. Rolfe, dated April 2, 1979 at 3 ("it is likely that Mr. Cary's testimony will enable IBM to narrow, and in some cases eliminate, testimony of other listed IBM witnesses where that testimony would be cumulative of Mr. Cary's testimony"); Affidavit of Joseph R. Sahid, dated May 3, 1979 at 2 (same). IBM has opposed the deposition of certain of its prospective trial witnesses, prior to Cary's trial appearance, on the grounds that Cary's testimony may narrow or eliminate the testimony of subsequent witnesses. *See* Memorandum in Opposition to Plaintiff's Motion for an Order to Compel Production of Certain Documents Relating to Arthur G. Anderson, May 3, 1979 at 3; Memorandum in Opposition to Plaintiff's Motion for an Order to Compel Production of Certain IBM Documents Relating to Richard B. Hanrahan, April 2, 1979 at 3.

matter of the witness' testimony. *Cf. CAB v. Hermann,* 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852 (1957) (per curiam).[18] The court does not have these documents before it, and quite likely it is not possessed of all the facts in the hands of counsel that may prompt them to follow up certain leads in the pursuit of evidence. Moreover, the evidentiary weight of the documents is not germane to the relevancy inquiry. "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The documents sought may serve various cross-examination purposes. One document authored by the witness may have use as a prior inconsistent statement; another document not authored by him may confront the witness with evidence contradictory to his testimony. A third may simply suggest avenues of inquiry. Having asserted the comprehensive scope of Cary's testimony, IBM may not now be heard to complain of plaintiff's appropriately comprehensive subpoena.

## II. *Need for the Documents*

The plaintiff's need for these documents is clear. Issue-oriented discovery between the parties ended on approximately July 1, 1974. A large part of the documents sought by the government, however, are documents generated from January 1, 1974 to date.[19] Cary's anticipated testimony on events subsequent to 1974 makes it reasonable for the government to be given access to those internal documents of IBM relating to his testimony from which cross-examination may be fashioned.[20] Without these documents, Cary's cross-examination would hardly resemble "the greatest legal engine ever invented for the discovery of truth." 5 Wigmore, Evidence § 1367 at 32 (Chadbourn rev. 1974). An engine without fuel has neither power not effect.

## III. *Overbreadth*

A document request is unreasonable when "it is out of proportion to the end sought, as when the person served is required to fetch all his books at once to an exploratory investigation whose purposes and limits can be determined only as it proceeds." *McMann v. SEC,* 87 F.2d 377, 379 (2d Cir.) (L. Hand, J.), *cert. denied,* 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937). The overbreadth element is but a restatement of the proposition that the relevance of and need for documents sought will bear on the reasonableness of the subpoena. To the extent a subpoena sweepingly pursues

18. *Hermann* concerned subpoenas duces tecum issued by the Civil Aeronautics Board in the course of an investigation into alleged violations of the Civil Aeronautics Act. The district court enforced the subpoenas:

> In laying the subpoenas alongside the charges in the Complaint, this Court cannot say that any of the documents or things called for in any of the subpoenas are immaterial or irrelevant to the proceedings before the Board, without an examination of all of the documents and things themselves, which this Court is not called upon to do at this stage of the proceedings.

*Hermann v. CAB,* 237 F.2d 359, 362 (9th Cir. 1956), *rev'd,* 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852 (1957) (quoting from the district court's unpublished memorandum and order). The court of appeals remanded, holding that the district court should have examined each document to determine its relevance. 237 F.2d at 364. In a per curiam opinion, the Supreme Court reversed the court of appeals, stating, "[a]s we read the order of the District Court, it duly enforced the Board's right to call for documents relevant to the issues of the Board's complaint . . . ." 353 U.S. at 322, 77 S.Ct. at 805. *See McPhaul v. United States,* 364 U.S. 372, 382–83, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960) (broadly-worded subpoena is reasonable when nature of inquiry permits no greater precision); *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 210 n. 48, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (same).

19. See paragraphs 10 and 11 of the schedule of documents appended to this opinion. Where IBM has already produced a document responsive to the subpoena either to the government or to specified private plaintiffs in related litigation, it need not be reproduced. Instruction 7 of the subpoena.

20. The argument of IBM's lead counsel that Cary has already been deposed in this and other actions and has testified in two other cases (note 5 *supra* ) is unpersuasive and of no moment. In complex antitrust litigation there is no substitute for the internal documents of defendant in preparation of cross-examination by the plaintiff.

material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable. Here, however, the court has concluded above that relevance and need have been amply demonstrated. To be sure, the subpoena is broad but not unreasonably so in light of its purpose.

IV. *Time Period*

A demand for documents should cover a reasonable time period to insure that the materials desired are sufficiently identified and to confine the search to relevant documents. However, when relevance and need have been demonstrated, "[t]he fact that the materials requested cover an extended period of time and are voluminous will not render the subpoenas invalid . . . ." *Democratic National Committee v. McCord,* 356 F.Supp. 1394, 1396 (D.D.C.1973). Paragraphs 10 and 11 of the document schedule, which apparently deal with the bulk of the materials sought, are specific as to time. Those paragraphs describe numerous categories of documents generated from January 1, 1974 to date relating to EDP, the IBM Corporation and Cary. The government has not had substantial document discovery from IBM files during that period. The time period is limited in accordance with the government's need for cross-examination materials relating to Cary's direct testimony and is therefore reasonable.[21]

V. *Reasonable Particularity*

Another element of the reasonableness requirement is that a subpoena must specify the documents sought with reasonable particularity, because vague or duplicative demands may cause confusion and disarray in responding to the subpoena. *See, e. g., Brown v. United States,* 276 U.S. 134, 143, 48 S.Ct. 288, 72 L.Ed. 500 (1928); *Austin Theatre, Inc. v. Warner Bros. Pictures, Inc.,* 30 F.R.D. 156, 158–59 (S.D.N.Y. 1958); *In re United Shoe Machinery Corp.,* 6 F.R.D. 347, 348 (D.Mass.1947). As with

most of the other variables that enter into the equation of reasonableness, the degree to which document requests must be specified depends upon the facts and circumstances of each case. *See Mallinckrodt Chemical Works v. Goldman, Sachs & Co.,* 58 F.R.D. 348, 353 (S.D.N.Y.1973). Particularization must be "adequate, but not excessive, for the purposes of the relevant inquiry." *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 90 L.Ed.2d 614 (1946). Complex litigation often involves large numbers of documents, the individual identity of each of which is unknown until disclosure is made. In such a context, common sense dictates that requests framed in terms of categories or types of documents are sufficient. Documents sought need not be individually specified. *See, e. g., Connecticut Mutual Life Insurance Co. v. Shields,* 17 F.R.D. 273, 276 (S.D.N.Y.1955). Perhaps an unavoidable byproduct of such categorization is a degree of duplication, and, indeed, one can easily imagine documents responsive to more than one category of the present subpoena. In many cases, the overlap is caused by the presence of general and specific descriptions. For example, paragraph 10(c)(10) calls for studies, reports or analyses relating to "[a]ny company competing with IBM with respect to any EDP product or service. . . ." while paragraph 10(c)(5) calls for studies, reports or analyses relating to "[m]inicomputers . . . competing with . . . other EDP products." Even if these and other paragraphs overlap as alleged by IBM and Cary, the problem is substantially abated by instruction 8 of the subpoena: "If a document is responsive to more than one paragraph, it should be segregated by the paragraph to which it is *primarily* responsive." Where a document is found that may be addressed to a more general as well as a more specific paragraph, it should—in keeping with the instruction—be produced in response to the more specific description. After an examination of the 53 paragraphs and subpara-

---

21. Paragraphs 1–9 and 12 are not limited by the January 1, 1974 to date time frame. However, the documents described in those para-graphs are of a very specific nature. The time frames imposed, either explicitly or implicitly, are not unreasonable.

graphs of the Cary subpoena, the court is unconvinced that IBM would be unable to determine which of its documents are *"primarily"* responsive to which paragraph or subparagraph of the subpoena.

The court's decision in *United States v. International Business Machines Corp.,* 72 F.R.D. 78 (S.D.N.Y.1976), is easily and entirely distinguishable from the present case. That decision dealt with IBM's Request for Documents dated March 30, 1974 which in part demanded "[a]ll documents reflecting, referring or relating in any way to the employment, duties, qualifications, ability or expertise" of certain government witnesses. The infirmity of that request was self-evident. The court held:

> Since all documents relating to an employee are theoretically concerned with his employment, on its face paragraph one demands every document in the "employing" agency's possession which in any way mentions one of the witnesses. Since this construction would make much if not all of the balance of the Request superfluous, the court must conclude that IBM in fact desires by this part of its demand less than every such document. What is desired is not reasonably particularized.

*Id.* at 82. On the basis of this holding, IBM has challenged the present subpoena for demanding, in paragraph 1,

> Such documents as will show each position, tenure in each position and duties in each position held by Frank T. Cary, including membership on any board, committee, task force or study group, and including honorary and unsalaried positions, from age 21 to the present. [This paragraph may be satisfied by a signed and notarized statement by Frank T. Cary based upon and adequately summarizing the information contained in the

above specified documents and certifying that the above specified documents were kept in the regular course of business.]

This demand, with its bracketed alternative, asks in effect for an employment history of the witness, and is a far cry from a demand for all documents "relating" to a witness' employment. There is little likelihood that this present demand will unduly overlap with the balance of the subpoena.

## VI. *Burden of Compliance*

For a variety of reasons the court is convinced that the burden of compliance does not make the subpoena unreasonable and oppressive.

 First, the burden of production must be compared with the size of and resources available to the responding party. As stated by Judge Weinfeld in denying a motion by RCA to quash a grand jury subpoena duces tecum:

> Inconvenience is relative to size. Any witness who is subpoenaed suffers inconvenience. An individual operating a small business, for example, or a corporation operated by a sole shareholder, may suffer, in like circumstances, more inconvenience than the movant with its thousands of employees. But this inconvenience, whether suffered by witnesses, grand jurors, or jurors, is part of the price we pay to secure the effective administration of justice and the enforcement of our laws.

*In re Radio Crop. of America,* 13 F.R.D. 167, 172 (S.D.N.Y.1952). *See FTC v. Rockefeller,* 591 F.2d 182, 190 (2d Cir. 1979) (compliance not a "threat to the normal operations of appellants' businesses considering their size"); *United States v. International Business Machines Corp.,* 62 F.R.D. 507, 509–10 (S.D.N.Y.1974).[22] Thus, while the inconven-

---

**22.** That opinion in part denied motions to quash or in the alternative for the advancement of costs as a condition of compliance with subpoenas duces tecum served by the parties on several nonparty corporations. In a finding equally applicable to the present motion, the court observed that the various claims of burden were greater in degree but not in kind than previous similar motions that the court had denied. Indeed, the court refused to order advancement of costs to RCA Corporation, which alleged that it had departed from the general purpose computer business and therefore would be obliged to hire and train a substantial number of employees unfamiliar with the subject matter simply to comply with the subpoena. Memorandum of RCA Corporation, March 22, 1974, at 2.

ience to be imposed by the Cary subpoena may be substantial on an absolute scale, when compared with IBM's size and resources it is neither unduly burdensome nor oppressive.

■ .Second, courts have long recognized that a substantial burden of compliance may be justified by the nature and importance of the inquiry involved. *See, e. g., FTC v. Rockefeller,* 441 F.Supp. 234, 242 (S.D.N.Y.1977), *aff'd,* 591 F.2d 182 (2d Cir. 1979); *Westinghouse Electric Corp. v. City of Burlington,* 122 U.S.App.D.C. 65, 70, 351 F.2d 762, 767 (1965); *In re Radio Corp. of America,* 13 F.R.D. 167, 171 (S.D.N.Y.1952). This court has emphasized time and time again that considerations of cost and burdensomeness must give way to the search for truth in this case of undoubted importance to the public weal. *See United States v. International Business Machines Corp.,* 71 F.R.D. 88, 92 (S.D.N.Y.1976); 66 F.R.D. 186, 189 (S.D.N.Y.1974); 62 F.R.D. 526, 529 (S.D.N.Y.1974). This principle applies with equal if not greater force to the present situation where the documents requested in the Cary subpoena are internal documents of defendant directly related to the projected testimony of defendant's chief executive officer.

■ Third, with the advent of office copier technology there is little danger that a substantial document request would denude a corporation of files and records essential to its continued operation. *See Hale v. Henkel,* 201 U.S. 43, 77, 26. S.Ct. 370, 50 L.Ed. 652 (1906); *In re United Shoe Machinery Corp.,* 6 F.R.D. 347 (D.Mass.1947). Indeed, while IBM and Cary have ingeniously supplied figures estimating the number of documents and consumption of time involved in production, they do not demonstrate that compliance would disrupt the day-to-day operation of IBM. *See FTC v. Rockefeller,* 441 F.Supp. 234, 242 (S.D.N.Y. 1977), *aff'd,* 591 F.2d 182 (2d Cir. 1979).

*Conclusion*

■ Accordingly, the court finds the subpoena to be neither unreasonable nor oppressive under the fourth amendment, if applicable, or rule 45(b). IBM's and Cary's motion to quash is denied.

IT IS HEREBY ORDERED THAT:

IBM and Cary immediately shall make available for inspection and copying by authorized personnel of the United States Department of Justice, at the premises or facilities of the IBM Corporation, all documents responsive to the February 7 subpoena. The obligation to produce such documents is an ongoing obligation and shall continue until all the trial testimony of Cary is completed.

In order to facilitate production, serve the convenience of the parties and perhaps mitigate the burden of compliance, the parties may enter into an agreement whereby compliance proceeds in stages. For example, the search for responsive documents in the first instance may be limited to particular files within Cary's possession, custody or control, or in any other reasonable manner. It cannot be overemphasized that the success of such a program depends upon the full and good faith cooperation of counsel.

SO ORDERED.

APPENDIX

III. DOCUMENTS TO BE PRODUCED

1. Such documents as will show each position, tenure in each position and duties in each position held by Frank T. Cary, including membership on any board, committee, task force or study group, and including honorary and unsalaried positions, from age 21 to the present. [This paragraph may be satisfied by a signed and notarized statement by Frank T. Cary based upon and adequately summarizing the information contained in the above specified documents and certifying that the above specified documents were kept in the regular course of business.]

2. Each biography, resume, employment history, speech, book, journal, article or other similar document written by Frank T. Cary at any time, whether published or unpublished.

3. All personnel records of IBM relating or referring to Frank T. Cary from age 21 to the present.

4. Such documents as will show any past or present financial interest of Frank T. Cary or his immediate family in IBM or any other company in the EDP industry, including without limitation documents which show (a) types of securities held, (b) number of shares held, and (c) dates of acquisition and disposition, without limitation as to time. [This paragraph may be satisfied by a signed and notarized statement by Frank T. Cary based upon and adequately summarizing the information contained in the above specified documents and certifying that the above specified documents were kept in the regular course of business.]

5. All documents authored, received, referred to, reviewed by Frank T. Cary in connection with or in preparation for any intended or anticipated testimony, including testimony by way of deposition, in this or any other lawsuit in which IBM is or was a party, without limitation as to time.

6. All affidavits authored by, prepared for, prepared by or signed by Frank T. Cary which relate in any manner to any aspect of EDP.

7. All transcriptions of testimony in whatever form given by Frank T. Cary at any trial, deposition, inquiry, hearing or other forum.

8. All documents relating or referring to Frank T. Cary's participation or involvement, direct or indirect, in any EDP-related litigation to which IBM is or has been a party.

9. All correspondence between Frank T. Cary and any other witness on IBM's 1974 witness list in *U. S. v. IBM* relating to any litigation.

10. Documents which are under Frank T. Cary's personal or corporate custody and control (including all documents under his custody and control in the files of the IBM Corporation) and were generated during the period January 1, 1974 to date, as follows:

(a) All documents relating to EDP which were authored by, addressed to, copied to, reviewed by, or relied upon by Frank T. Cary.

(b) All documents relating to:

(1) Meetings attended by Frank T. Cary at which EDP was discussed (including all agendas, slides, minutes, memoranda, notes or other memorializations of such meetings).

(2) Oral presentations made to Frank T. Cary which related to EDP (including all written presentations, memoranda or documents of any kind relating to such oral presentations).

(3) Oral presentations made by Frank T. Cary which related to EDP (including all written presentations, speeches, memoranda or documents of any kind relating to such oral presentations).

(4) The failure or abandonment of the once-planned IBM product line known as FS ("Future System").

(5) The offering of EDP products or services in the United States by companies headquartered outside the United States, including, but not limited to, European and Japanese firms.

(c) All studies, reports or analyses relating in whole or in part to:

(1) Use of computer systems to perform in multiple modes, e. g., batch, time-sharing, transaction processing, process control, under the control of a single operating system.

(2) Use of data base management systems in conjunction with one or more of the modes of operation of a computer system listed in 10.(c)(1).

(3) Capabilities required of computer systems and their systems software to enable them to handle the average run of applications and modes of processing required by business users.

(4) Microcomputers or microprocessors as part of, competing with, augmenting, complementing, interchangeable with, or substituting for larger computer systems or other EDP products.

(5) Minicomputers as part of, competing with, augmenting, complementing, interchangeable with, or substituting for larger computer systems or other EDP products.

(6) Terminals, communication controllers, front-end processors, back-end processors and other devices used in connection with a communications network, as part of, competing with, augmenting, complementing, interchangeable with, or substituting for other EDP products, such as CPU's.

(7) Competition and/or marketing of EDP products and services on a "box" basis and/or a "systems" basis.

(8) The marketing of computer systems and other EDP products and services "off the shelf" in "packaged" form, and/or "customizing" them for specific users.

(9) IBM plug-compatible CPUs as competing with IBM manufactured CPUs or computer systems.

(10) Any company competing with IBM with respect to any EDP product or service, including, but not limited to, any vendor of IBM plug-compatible CPUs.

(11) "Systems integrators" or "assemblers" as competitors of EDP manufacturers.

(12) Used equipment vendors as competitors of EDP manufacturers.

(13) Software vendors as competitors of EDP manufacturers.

(14) Leasing companies as competitors of EDP manufacturers.

(15) Distributed or decentralized data processing as an alternative or a complement to centralized data processing.

(16) Actual or potential effects on competitors of the use of microcode by IBM.

(17) Use of satellite communications or other communications systems related to EDP.

(18) Semiconductor technology, including the effects of technology changes on the manufacture of EDP products, and changes in the methods of design, manufacture and testing of semiconductor devices.

(19) Actual or possible effects on competitors of 3830–II; the ISC for 370/145, 370/158, 370/168; the 3330 IFA for 370/135; the minimum memory of the 370/138, 370/148, 370/158, 370/168; the channel director for 3031, 3032, 3033.

(20) IBM's development, manufacture, testing, announcement, delivery, pricing (including, but not limited to, lease/purchase price relationship), profitability, or problems with the IBM 3031, 3032, and 3033 processors, including all hardware, software, maintenance and/or other services associated in any way with the above described processors.

(21) Markets for IBM's 8100 series and 4300 or "E" series of computers, and/or actual or possible effects on competitors of these computers.

(22) Actual or proposed changes in the structure, methods of production and marketing, or product lines of any Division, Product Complex or Product Group of IBM.

(23) Market trends in the EDP industry.

(d) All MRC, MC or CMC minutes, and minutes of any similar, successor or predecessor committees or groups.

(e) Organizational charts or directories of any sort for the IBM Corporation, any component thereof, or group therein for which an organizational chart or directory exists.

(f) All plans, projections and analyses which, when issued, related to the future, including but not limited to all operating plans and strategic plans for the IBM Corporation, and for any part of the corporation, e. g., 2 year operating plans, 5 year strategic plans and 7 year strategic plans for the DP Group.

(g) All QPLA's and other similar successor studies or analyses which describe or discuss EDP products and services which compete with IBM EDP products and services.

(h) All Greybooks and similar successor financial studies studies [sic] or analyses.

(i) All studies known in this litigation as "Jackson Documents" and similar successor studies generated by IBM's Commercial Analysis Department, or any successor thereto.

11. All documents, not produced in response to paragraph 10, which are under Frank T. Cary's personal or corporate custody and control (including documents under Frank T. Cary's custody and control in the files of the IBM Corporation) which were generated during the period January 1, 1974 to date, and which relate to IBM policies, practices or decisions on the following subject matters in which Frank T. Cary had knowledge or participation.

 (a) Identification and analysis of markets, submarkets, or parts of commerce into which IBM's EDP products or services are marketed.

 (b) The ability of any actual or potential entrant to manufacture or market any EDP product or service.

 (c) Competition or lack of competition in any market, submarket or part of commerce made up in whole or in part of any EDP product or service.

 (d) Factors and policies considered in IBM's pricing of EDP products and services; consideration in pricing exercises of commonly marketed systems configurations; consideration in pricing exercises of the effect on competition of various pricing options.

 (e) Effect on EDP competitors of IBM of pricing, product, or other business practices of IBM, such as, *inter alia*, account control, software lock-in, bundling, influence of industry product standards, control of product life, and offering of communications services.

 (f) IBM's intent or lack of intent to increase, decrease or maintain its share of any EDP market or submarket or segment of the industry.

 (g) IBM's skill, foresight and industry or lack thereof in the design, development, manufacture, marketing and maintenance of EDP products, or services.

 (h) Excellence or lack of excellence of IBM's EDP products, manufacturing, services or management.

12. All reports of interviews of Frank T. Cary relating to EDP by employees of IBM, Smithsonian Institution, AFIPS or any other organization.