**UNITED STATES of America,
Petitioner,**

v.

**Paul L. TEEVEN, in his capacity as
President of USA Training
Academy, Inc., Respondent.**

**Misc. A. No. 90–01 LON.**

United States District Court,
D. Delaware.

Aug. 28, 1990.

**222**

Patricia C. Hannigan, U.S. Atty's Office, Wilmington, Del. (Joan E. Hartman, argued, Dept. of Justice, Washington, D.C., of counsel), for petitioner.

Steven D. Goldberg of Theisen, Lank, Mulford & Goldberg, Wilmington, Del. (Martin D. Minsker, argued, Randall J. Turk and Cynthia A. Thomas of Miller, Cassidy, Larroca & Lewin, Washington, D.C., of counsel), for respondent.

## OPINION

LONGOBARDI, Chief Judge.

Presently before the Court is the petition of the United States (the "Government") for an order summarily enforcing a subpoena duces tecum issued by the Inspector General ("IG") upon the respondent to produce certain records and documents as set forth in the subpoena. *See* Docket Items ("D.I.") 1, 2. *See also* D.I. 1 at Attachment F. The Respondent, Paul L. Teeven, opposes the petition. Also before the Court is the motion of USA Training Academy (the "Academy") for an evidentiary hearing and permission to take discovery in advance of that hearing. D.I. 9.

## BACKGROUND

The Academy is a for-profit educational institution incorporated under the laws of the State of Delaware. The Academy offers truck driving and secretarial training courses throughout the United States. The Respondent, Paul L. Teeven, is the President of the Academy. The Academy's courses are certified to participate in student financial aid programs administered by the Department of Education (the "Department") pursuant to Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.* Accordingly, the Academy is subject to periodic program reviews or audits by the Department or the IG.

As of award year 1988–1989, the Department has insured approximately 283 million dollars in Stafford Loans for students attending the Academy. D.I. 1 at Horn Declaration, ¶ 1. Under the Stafford Loan program (formerly known as the Guaranteed Student Loan program) the Department insures loans by financial institutions to students who attend eligible institutions of higher learning. *Id.,* ¶ 5.b.[1] Stafford Loan funds are sent directly by private lenders to the Academy, 34 C.F.R. § 682.604(b)(1), on behalf of the eligible students, with nonprofit agencies providing guarantees for the loans, 20 U.S.C. § 1078(c). While the student is in school and during a six-month post-graduation grace period, the Department pays to the lender the interest that the student will pay upon graduation as well as an additional amount of interest called the "special allowance" and an administrative cost allowance to the guarantee agency. After the student begins to repay the loan, the Department continues to pay the "special allowance" until the loan is repaid in full. If the student defaults on the loan, the Department is responsible to pay the guarantee agency unpaid principal plus accrued interest. Currently, there are approximately 54 million dollars in loans to students of the Academy which are in default. The 1987 figures indicate that the default rate at the Academy is 46 percent.

---

**1.** In fiscal year 1988, the Department insured a total of approximately 11.8 billion dollars in Stafford Loans, increasing to 89 billion dollars the cumulative amount of loans so insured since the start of the program in fiscal year 1966. D.I. 1 at Horn Declaration, ¶ 5.b.

In award year 1988–1989, the Academy's students have also received more than 17 million dollars in Pell Grant funds. Under the Pell Grant program (formerly known as the Basic Educational Opportunity Grant program), the Department gives direct grants of funds to eligible institutions of higher learning on behalf of the eligible students who attend those institutions.[2]

Only "eligible" institutions may participate in the Stafford Loan and Pell Grant programs. Once the institution is eligible, it enters into a program participation agreement with the Secretary of the Department (the "Secretary"). *See* 20 U.S.C. § 1094(a); 34 C.F.R. § 668.12; 34 C.F.R. § 682.600(a)(2) (Stafford Loan program). *See also* 20 U.S.C. § 1094(a); 34 C.F.R. §§ 690.71, 690.12(a) (Pell Grant program). The institution must, *inter alia*, comply with the agreement and the applicable regulations incorporated in the agreement. *See, e.g.,* 34 C.F.R. parts 690, 668 and 600; *see* 20 U.S.C. § 1094(a); 34 C.F.R. §§ 690.-7(a)(1), 668.12(b)(2)(i) (Pell Grant program). *See also* 34 C.F.R. parts 682, 668 and 600; 34 C.F.R. §§ 668.12(b)(2)(i), 682.600(b) (Stafford Loan program).

In June of 1988, the Philadelphia, Pennsylvania, Investigative Services Office, a component of the IG, opened a preliminary inquiry into the Academy. D.I. 1 at Horn Declaration, ¶ 9. In 1989, Audit Services, a separate component within the IG, decided to do an audit of the Academy and attempted to conduct the audit commencing March 14, 1989. *Id.* Part of the data that Audit Services had sought from the Academy was maintained on a computerized record-keeping system. *Id.* The IG auditors have repeatedly but unsuccessfully attempted to obtain that data. *Id.,* ¶ 9.[3]

The Office of the IG ("OIG") was subsequently informed that in preparing for the audit, agents of the Academy removed documents from the audit site, altered computer records and made false statements to IG auditors. *Id.,* ¶ 10; *see, e.g.,* D.I. 1 at Attachment E. The substantial allegations of possible fraud and abuse received by the OIG and the large sums of federal grants paid to the Academy as well as the large volume of Stafford Loans and default rate resulted in the Philadelphia branch of the IG recommending that the Inspector General issue a subpoena for the records needed for the OIG to review and evaluate the allegations. D.I. 1 at Horn Declaration, ¶ 11. On September 6, 1989, the IG issued a subpoena for the records to the Academy. *Id.,* ¶ 12.

The IG asserts that the records sought are needed to determine whether, *inter alia*, the Academy is in compliance with statutory and regulatory standards for institutional eligibility for participation in the Pell and Stafford programs; the Academy insures that prompt refunds are made to Stafford Loan lenders when an eligible student withdraws or is found to be ineligible; the Academy properly evaluates student eligibility for these programs and tracks their eligibility over the course of the student's enrollment; and the Academy has instituted proper fiscal management, has adequate record keeping and retention policy and has the financial and administrative capability to participate in the Department programs. *Id.,* ¶ 12. The subpoena also seeks records which would allow the IG to identify the types of files kept by the Academy as to the Academy's involvement in the Department's programs; to allow identification of those individuals involved in any violations of statutes or regulations; to determine whether relevant records have

---

**2.** In fiscal year 1987, the Department disbursed a total of approximately 3.74 billion dollars in Pell grants increasing to about 30 billion dollars the cumulative total amount of such grants since the start of the Pell program in fiscal year 1973. D.I. 1 at Horn Declaration, ¶ 5.a.

**3.** The audit reached an impasse when the IG computer specialists requested to review copies of eight computer files off the premises of the Academy. *See* D.I. 12 at 10. These files were

ultimately requested in the IG subpoena. Copies of these files were needed by the IG so that reliability and other tests could be taken of them on the IG's different type of computer system. *Id.* at 11–12; *see infra* note 26 for discussion of the need to audit copies of the computer files on the IG's computers as opposed to the Academy's computer system. The Academy's computer system is not compatible to the IG's system.

been altered, destroyed or concealed and the extent to which fraud, abuse or false statements tainted the Academy's participation in Department programs. *Id.,* ¶ 13. The Academy has failed to comply with the subpoena.[4]

On July 26, 1989, pursuant to a search warrant, a search of the Academy was conducted jointly by the U.S. Attorney's Office in Delaware, the Federal Bureau of Investigation ("FBI") and the Region III IG Office of Investigations. D.I. 12 at 13. Two weeks prior to the search, some of the auditors who participated in the March, 1989, audit were asked to participate in the search. *Id.*[5] The documents eventually seized from the Academy were placed in a warehouse. *Id.* An IG auditor, James Cornell, reviewed these documents for three hours; he was then informed that the Academy had filed a motion for the return of the documents. *Id.* Cornell was instructed to stop his review and destroy his work papers, which he did. *Id.* No one else from the IG's Office reviewed the documents after the motion was filed. *Id.* The U.S. Attorney's Office in Delaware eventually decided to return the seized documents to the Academy prior to the time set by the Court for a hearing on the Academy's motion. *Id.*

## DISCUSSION

### 1. *The Legal Standards*

■ Pursuant to the Inspector General Act of 1978, Pub.L. No. 95–452, codified at 5 U.S.C. App. 3 §§ 1–12, (the "IG Act"), the

OIG has the duty and responsibility of uncovering fraud, waste and abuse in, and to ensure the integrity of, federal programs such as the Stafford and Pell programs. *See* 5 U.S.C. App. 3 §§ 2, 4. *See also* S.Rep. No. 95–1071, 95th Cong., 2nd Sess. *reprinted in* 1978 U.S.Code Cong. & Admin.News 2676. When the IG uncovers fraud, waste or abuse, the IG has the responsibility to recommend appropriate action, including criminal, civil and administrative remedies. *Id.* The IG is given the statutory duty "to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of" the Department. 5 U.S.C. App. 3 § 4(a)(1). In carrying out the provisions of the IG Act, each IG is authorized to:

> require by subpena [ (*sic.*) ] the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this [IG] Act, which subpena [ (*sic.*) ], in the case of contumacy or refusal to obey, shall be enforceable by order of any appropriate United States district court....

*Id.* at § 6(a)(4).[6]

"Courts will enforce a subpoena if (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 166 (3rd Cir.1986), *citing United States v. Pow-*

---

**4.** The subpoena was drafted by Stephen J. Gelfand, the Regional IG for Investigations, Region III. D.I. 12 at 13. Gelfand participated in the July, 1989, search of the Academy but he did not review any of the documents obtained as a result of the search. *Id.* Furthermore, Gelfand has declared that he used nothing gained in the search to draft the subpoena, *id.* at 14, and he has never had access to any matters before the grand jury in this matter. *Id.* Gelfand did not consult with anyone who has had access to the grand jury when he drafted the subpoena and, at the time, had no knowledge the grand jury had been convened. *Id.*

**5.** These included James Cornell, the supervisory auditor, and Sue Taeuber, one of the computer specialists.

**6.** Congress was well aware of the need for the IG to have compelled access to the records of recipients of federal funds to ensure that fraud and abuse could be detected.

> Subpoena power is absolutely essential to the discharge of the Inspector and Auditor General's functions. There are literally thousands of institutions in the country which are somehow involved in the receipt of funds from Federal programs. Without the power necessary to conduct a comprehensive audit of these entities, the Inspector and Auditor General could have no serious impact on the way federal funds are expended.

S.Rep. No. 95–1071, 95th Cong., 2d Sess. *reprinted in* 1978 U.S.Code Cong. & Admin.News 2676, 2709.

*ell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964) and *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950). Once the Government has satisfied this *prima facie* standard, the court will summarily enforce the subpoena unless the party opposing enforcement of the subpoena makes a sufficient showing that summary enforcement would abuse the court's process. *Westinghouse Elec.,* 788 F.2d at 166–67; *see also S.E.C. v. Wheeling–Pittsburgh Steel Corp.,* 648 F.2d 118, 128–29 (3rd Cir. 1981) (*en banc*). "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *United States v. Powell,* 379 U.S. at 58, 85 S.Ct. at 255.[7] In the event that potential abuse of the court's process in summarily enforcing the subpoena is sufficiently presented by the party opposing the summary enforcement, the court may grant such party limited discovery and an opportunity for an evidentiary hearing. *See Wheeling–Pittsburgh,* 648 F.2d at 128–29.

In *Wheeling–Pittsburgh,* the Third Circuit *en banc* chose not to impose limitations as to the circumstances which would amount to an abuse of the court's process in determining whether to summarily enforce an administrative subpoena. The court disagreed "with the ... premise that the Supreme Court has foreclosed incremental development of the law by the courts when faced with allegations of egregious abuse." *Wheeling–Pittsburgh,* 648 F.2d at 123. The court recognized "that whether to enforce an administrative subpoena is a judicial determination, based on the totality of the particular circumstances proven on a given record." *Id.* at 124. Furthermore, the court noted that it would not serve as a mere "rubber stamp" to an executive branch investigative body and that the courts are not "powerless to struc-

ture relief when necessary." *Id.* The "persistent theme running through the [Supreme] Court's decisions in this area [is] that an administrative summons can be challenged 'on any appropriate ground.'" *Id., quoting Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964). The court deemed "the equitable powers of federal courts to deny enforcement in appropriate cases to be very significant." *Id.* at 125.

The Government argues that the standard set forth by the Third Circuit's *en banc* decision in *Wheeling–Pittsburgh* is no longer viable because that standard was based on Supreme Court decisions involving Internal Revenue Service ("IRS") subpoenae and Congress has since legislatively overruled those cases. It also argues that the appropriate standard to be applied in this case is that the court only has discretion to conduct an evidentiary hearing in the "unlikely" situation where the party opposing the subpoena has presented affidavit evidence that the agency "is acting without authority or where its purpose is harassment of citizens." *See* D.I. 12 at 42. The Government contends that *U.S. v. Aero Mayflower Transit Co., Inc.,* 831 F.2d 1142, 1146–47 (D.C.Cir.1987) is controlling. In that case, the Circuit Court stated that "discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty." *Aero,* 831 F.2d at 1146, *quoting SEC v. Dresser Indus.,* 628 F.2d 1368, 1388 (D.C.Cir.) (*en banc*), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). "Those are the circumstances referred to by the Supreme Court in *Powell,* 379 U.S. at 58 [85 S.Ct. at 255], ... where a government agency is acting without authority or where its purpose is harassment of citizens." *Aero,* 831 F.2d at 1146–47.[8] The *Aero* decision, however,

---

7. At oral argument, counsel for the Government conceded that the Court should inquire into whether enforcement of the subpoena would abuse the Court's process. D.I. 25 at 7.

8. *Dresser,* which was decided in 1980, relied upon *United States v. LaSalle National Bank,* 437 U.S. 298, 316–17, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978). In *Dresser,* the Circuit Court said that "discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty." *Dresser,* 628 F.2d at 1388.

rests on the D.C. Circuit's interpretation of the *Powell* line of cases. That interpretation appears to differ from the Third Circuit's interpretation of those cases. To the extent that *Aero* is inconsistent with the standard set forth in *Wheeling–Pittsburgh*, this Court remains bound by the *en banc* decision of the Third Circuit set forth in *Wheeling–Pittsburgh*.

The Court is unpersuaded that the *Wheeling–Pittsburgh* standard has been abandoned as the appropriate standard in this case.[9] The fact that it may have been developed from the IRS cases carries less significance given that the *Wheeling–Pittsburgh* case involved the Securities and Exchange Commission and not the IRS. Furthermore, the subsequent Third Circuit cases relied on by the Government, while they may cast some doubt on *Wheeling–Pittsburgh*'s continuing vitality, are distinguishable and do not expressly overrule that case. The first Third Circuit case relied on by the Government is *U.S. v. Educational Development Network Corp.*, 884 F.2d 737 (3rd Cir.1989) ("*EDN*"), *cert. denied*, —— U.S. ——, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990). In *EDN*, the issue before the Third Circuit was whether the use of a subpoena issued by the Department of Defense IG after the criminal division of the United States Attorney's Office filed a Federal Rule of Criminal Procedure 6(e) Notice of Disclosure violated the fifth amendment rights to due process and indictment only by action of a grand jury allegedly held by Educational Development. *EDN*, 884 F.2d at 738. In *EDN*, the appellants relied on the Supreme Court decision in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), "in support of their position that the use of civil investiga-

tive powers is improper when there is an ongoing criminal investigation." *Id.* at 741. The Circuit Court distinguished *LaSalle* as a case "decided under § 7602 of the Internal Revenue Code and is relevant only in criminal cases involving the IRS." *Id.* at 742. Those cases, such as *LaSalle*, *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), and *Powell* "do no more than establish standards for determining when an administrative agency that has only civil enforcement powers is engaged in an investigation aimed at developing a criminal case, and is hence acting beyond its statutory authority." *Id.* at 742, *quoting Donovan v. Spadea*, 757 F.2d 74, 77 (3rd Cir.1985). The Third Circuit also recognized that the *Aero* court found *LaSalle* "totally inapposite" since there was no body of law restricting the IG's ability to cooperate with the Justice Department in exercising criminal prosecutorial authority. *EDN*, 884 F.2d at 743 ("The court in *Aero Mayflower* found nothing wrong with the Justice Department's use of IG subpoenas rather than grand jury subpoenas, since grand jury matters could not be shared with the [Department of Defense]"). In *Moutevelis v. United States*, 727 F.2d 313 (3rd Cir.1984), also relied upon by the Government in this case to cast doubt on *Wheeling–Pittsburgh*, the taxpayer contended that he was entitled to some discovery before the court dismissed his motion to quash an IRS summons because he argued it was issued for a criminal rather than civil purpose. *Id.* at 315. The Third Circuit said that "[t]he district court was not required to permit discovery for the establishment of a fact which, since the enactment of Section 333(b) of TEFRA is simply irrelevant." *Id.*[10] In *Moutevelis*, the taxpayer made no other allegations "which would other-

---

9. Indeed, the Third Circuit specifically cited to the *Wheeling–Pittsburgh en banc* decision in the *Westinghouse Elec.* decision where the court said "if a subpoena is issued for an improper purpose, such as harassment, its enforcement constitutes an abuse of the court's process." *Westinghouse Elec.*, 788 F.2d at 166–67. Presumably, the Third Circuit would not have relied on *Wheeling–Pittsburgh* on this issue if, as the Government had argued, it was no longer good law. *See also E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 980 (3rd Cir.1988)

(recognizing the continued vitality of *Wheeling–Pittsburgh* on abuse of process issue), *aff'd*, —— U.S. ——, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

10. The effect of sections 333(b) and (c) of TEFRA was to "establish that an investigation by the Internal Revenue Service 'into any offense connected with the administration or enforcement of the internal revenue laws' is a valid purpose for use of a summons. However, no summons may issue to any person with

wise bear upon the enforceability of the summons." *Id.*

The legislative history to TEFRA is informative:

> The restrictions on the use of administrative summonses stated in *LaSalle* arise from the provision of present law which limits the use of administrative summons to the determination and collection of taxes. The bill expands this authority to include the right to issue a summons for the purpose of inquiring into any offense connected with the administration or enforcement of the Internal Revenue laws.
>
> The bill does not in any way alter the other requirements under present law that the Secretary make the showings required under *U.S. v. Powell....*

S.Rep. No. 97-494, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Admin.News 781, 1032. Thus, that which would have been an improper purpose for an IRS subpoena under *LaSalle* (*i.e.*, institutional posture towards criminal referral), no longer is such. *See Moutevelis*, 727 F.2d at 314-15 (discussing "bright line" test set forth under TEFRA). This institutional posture of criminal referral by the IRS no longer may be relied upon by a taxpayer for purposes of arguing that enforcement of such a subpoena would abuse the court's process. That, however, is not involved in the present case. That alone, however, in the absence of an overruling of *Wheeling–Pittsburgh* does not sound the death knell to *Wheeling–Pittsburgh.*

Thus, this Court is of the opinion that *Wheeling–Pittsburgh* provides for judicial inquiry to determine whether the summary enforcement of the subpoena would amount to an abuse of the Court's process. The Third Circuit cases cited by the Government, while casting some doubt on the continuing viability of the *Wheeling–Pittsburgh* standards, do not overrule that case; accordingly, this Court is bound by *Wheeling–Pittsburgh.* However, having so concluded, the burden remains on the party opposing summary enforcement to present sufficient evidence to warrant inquiry into whether summary enforcement would abuse the court's process.

2. *Arguments of the Parties* [11]

(a) Prima Facie Case

 In order to satisfy its *prima facie* case, the IG may submit affidavits or sworn declarations. *See, e.g., Wheeling–Pittsburgh*, 648 F.2d at 128; *see also In re EEOC*, 709 F.2d 392, 400 (5th Cir.1983). The Academy indicated at oral argument that the IG has satisfied its *prima facie* burden in all respects except that the Academy argues the subpoena is too indefinite and unduly burdensome.[12] *See* D.I. 25 at 48. The subpoena at issue is within the authority of the IG. The declarations clearly establish that the IG of the Department has statutory responsibility to prevent and detect fraud and abuse in the Department's programs and operations. This includes the Academy's participation in the Stafford Loan and Pell Grant programs. Furthermore, the materials sought appear to be reasonably relevant to the detection of fraud and abuse with respect to those federal programs.

The Academy argues that the subpoena is unduly burdensome because the Acade-

---

respect to whom a Justice Department referral is in effect." *Moutevelis*, 727 F.2d at 314.

11. There is no need for the Court to consider the issue of whether the fourth amendment's exclusionary rule applies to civil cases because, as the Academy has stated:

> its case [is] that enforcement of the IG subpoena ... would abuse the Court's process. No proceedings are before the Court from which the Academy has sought to exclude the documents as evidence. The Academy has sought to prevent the IG only from obtaining the documents ... not from using the documents in a later proceeding.

D.I. 17 at 20.

12. The Academy also argued that the Horn Declaration filed contemporaneously with the petition for summary enforcement was not properly sworn under penalty of perjury. The IG corrected this deficiency by filing a corrected declaration which was properly sworn. Furthermore, the Academy argued that the Horn Declaration did not properly support the IG's *prima facie* case because it was allegedly based on incompetent hearsay. The IG corrected this potential problem by submitting the Gelfand Declaration given by the person who drafted the subpoena. *See* D.I. 12 at A1.

my needs continuing access to its files "which could well be inconsistent with it making them available to the IG." D.I. 16 at 18.[13] Furthermore, the Academy argues that it does not have the space to accommodate IG personnel on its premises and at the same time permit the Academy to conduct its own internal investigations and prepare its defenses to possible future charges. *Id.* The Academy also argues that if the Court orders enforcement of the subpoena, the IG should be required to pay the costs associated with copying the subpoenaed documents. *Id.* at 19.

The Academy has contractually agreed to maintain those materials pertinent to the federal student loan and grant programs in which they participate. *See, e.g.,* 34 C.F.R. § 668.23.[14] Furthermore, the Academy agreed to provide access to such materials to the Department and its duly authorized representatives. *Id.* While this contractual and regulatory obligation does not automatically and necessarily foreclose further inquiry into the summary enforcement of the IG subpoena, it does serve as a basis to reject, possibly with conditions, the Academy's argument of undue burden. The burden in complying with the subpoena must be viewed in light of the nature of the information sought by the subpoena. Here, the IG is seeking to investigate the Academy for purposes of uncovering evidence of fraud, mismanagement and abuse. *See, e.g.,* D.I. 25 at 9–10. As such, the IG is performing a function important to the integrity of the nation's student financial aid programs. *Cf. United States v. Intern. Bus. Mach. Corp.,* 83 F.R.D. 97, 109 (S.D.N.Y.1979) (search for truth in cases of undoubted importance to the public weal weigh heavily against considerations of burdensomeness).

The Academy asserts that the description of the information sought by the subpoena is too indefinite to be enforced. *See* D.I. 11 at 35–41. The definiteness of description of documents sought by a subpoena must be decided in light of the facts and circumstances of the particular situation. It is only reasonable definiteness that can be required. *See, e.g., Westinghouse Elec.,* 788 F.2d at 166; *Intern. Bus. Mach. Corp.,* 83 F.R.D. at 107. In clarifying the items sought by the subpoena, the IG has represented that the documents being sought by the subpoena "are the documents that USA Training is required by law and contract to keep and make available to the Secretary and the IG pursuant to 34 C.F.R. § 668.23(f)(1)." D.I. 12 at 35.[15] Due to the nature of the items requested, the fact that most, if not all, are required to be maintained by contract and regulation, *see* D.I. 25 at 13, and the large number of documents necessarily involved, the description of the documents set forth in the subpoena (as modified by the Gelfand Declaration, *see* D.I. 12 at A5–A7) is reasonably definite. *Cf. Intern. Bus. Mach. Corp.,* 83 F.R.D. at 107 (where large numbers of documents are involved and the identity of each specific document may be unknown until disclosure is made, "common sense dictates that questions framed in terms of categories or types of documents are sufficient").

## (b) Abuse of Process

The Academy raises several arguments why summary enforcement of the subpoe-

---

**13.** The IG has offered to review and copy the materials on the Academy's premises with the exception of the computer files which it needs to review on its own system, to remove any burden to the Academy in not having access to its files. D.I. 12 at A5, ¶ 10.

**14.** That section provides that institutions that participate in the Stafford (GSL) Loan and Pell Grant programs, 34 C.F.R. § 668.23(a), for purposes of audit and examination, *id.* at § 668.23(b), shall give access to the Secretary and his duly authorized représentatives to the records and other pertinent information related to those programs, *id.,* and make them "[r]eadi-

ly available for review ... at the geographical location where the student will receive his or her degree or certificate of program or course completion." *Id.* at § 668.23(f)(3)(ii). The Academy agreed in its program participation agreement to be bound by these regulations. *See, e.g.,* D.I. 1 at Appendix C ("The [Academy] understands and agrees that it is subject to ... the Student Assistance General Provisions regulations, 34 C.F.R. Part 668").

**15.** Furthermore, Mr. Gelfand, the draftsman of the subpoena, provided additional clarifications to the Academy as to those matters sought by the subpoena. *See* D.I. 12 at A5–A7, ¶ 12.

na would abuse the court's process. These reasons asserted are: (1) the subpoena is premised on information obtained through fraud, trickery and deceit perpetrated by the IG upon the Academy during the audit of the Academy; (2) the subpoena is premised upon information acquired through an allegedly unconstitutional criminal search and seizure at the Academy; and (3) enforcement of the subpoena would entail violation of the rules of grand jury secrecy. *See* D.I. 11 at 7–8.

#### (i) *Audit Deception*

In support of its claim of fraud, trickery and deceit, the so-called "audit deception" allegations, the Academy offers the following evidence. The IG commenced an audit of the Academy on March 14, 1989. *See* D.I. 8A at 10001, ¶ 3, Declaration of Garvin dated February 22, 1990 (hereinafter "Garvin Declaration I"). The IG auditors were at the Academy for approximately two weeks conducting interviews of Academy personnel and reviewing Academy records. *Id.*, ¶ 4. "James Cornell was one of the agents present during the audit, and he told [Garvin] that he didn't know what the agents who were working with the Academy's computer were doing as their part of the audit, that he was just doing a routine audit." *Id.*, ¶ 5. Garvin also stated that during the audit entrance conference, Cornell mentioned that there were audit, investigative and combined activities undertaken by the IG. D.I. 17 at A1000044, ¶ 5 ("Garvin Declaration III"). When Garvin asked "which were we[,]" Cornell told Garvin "in substance that the IG was here for a routine audit and that we[, the Academy,] were not accused of any wrongdoing." *Id.* During the March 30, 1989, meeting with the IG auditors, "one of the IG representatives, in substance, again told us that the audit was routine and that the Academy was not accused of any wrongdoing." *Id.* at A100045, ¶ 6. Throughout the audit, the IG auditors:

have assured the Academy that there are no allegations of wrongdoing by the school, and that the Academy was selected for an audit solely because of its size and the amount of federal funds its students are receiving. The auditors have also assured the Academy that the audit is routine and designed merely to ensure that there are no irregularities in the Academy's handling of federal funds supplied to the Academy by the Department of Education pursuant to the Pell and GSL [ (Stafford) ] programs.

D.I. 8B at 200087–88, ¶ 17, Declaration of Garvin, dated July 31, 1989 (hereinafter "Garvin Declaration II"). The Academy also offers Garvin's Declaration to the effect that the Academy continued to rely on the IG's assurances that the audit was routine and that the Academy was selected for the audit based on its size and volume of federal aid used by its students. *See, e.g.,* Garvin Declaration III at ¶¶ 7, 9, 14, 19, etc. The Academy argues that if it had known that the IG auditors were on its premises pursuant to allegations of wrongdoing by the Academy, the Academy would not have voluntarily complied with the IG audit and would have instead forced the IG to obtain a subpoena or a warrant. Further, counsel for the Academy would have attempted to be present at all interviews conducted by the IG auditors of the Academy's personnel.

The IG has offered sworn declarations establishing that the IG auditors were in fact doing a routine audit and the statements made by the IG auditors to Garvin were true. Hugh M. Monaghan, the Regional IG for Audit, OIG, Region III, for the Department, the IG representative who initiated the March audit of the Academy, has set forth in his declaration that he authorized the audit based upon a computer printout dated October 7, 1988, prepared by the Office of Audit's Advanced Techniques Branch. D.I. 12 at A8, A15.[16] Monaghan reviewed the printout in November

---

**16.** The computer printout indicated that the Academy was the second largest recipient of Stafford and Pell program funds in the United States and the largest recipient within Region III. D.I. 12 at A8, A15. The printout indicates that over a one year period (July 1, 1986, through June 30, 1987) the Academy received more than 64 million dollars in Stafford and Pell program funds. *Id.*

of 1988 and IG auditors, under his direction, commenced preliminary work that month towards formulating an audit plan. *Id.* at A8. He "had no knowledge of any allegations of wrongdoing by the [Academy] when [he] selected it for audit. The audit was intended to be a routine one." *Id.* at A8–A9. As part of IG routine practice prior to an audit, Monaghan contacted the Regional IG for Investigations in February, 1989, to determine whether there were any pending investigations of the Academy and, if so, if the audit would interfere with it. *Id.* at A9. None of the details of the investigation were discussed between the Investigations Branch and the Audit Branch. *Id.*[17] The Regional IG of Investigations informed Monaghan that the audit could proceed without interfering with the investigation and that the audit could proceed only if it were planned and executed wholly apart from the investigation. *Id.; see also* D.I. 12 at A3. During the time that the "audit" of the Academy was underway, the Investigations Branch did not share any information with the IG auditors. *Id.* at A3, A9, A18.

It appears from the record that prior to the date the audit was suspended, James Cornell, the supervisory auditor, was asked about the nature of the audit.[18] *Id.* at A20, ¶ 6; A23, ¶ 3. While Cornell was instructed to refer any questions of whether there were allegations of wrongdoing against the Academy to the Regional IG for Investigations, *id.* at A10, ¶ 6; A19, ¶¶ 4, 20, 5; no one ever specifically asked Cornell if there were allegations of wrongdoing against the Academy. *Id.* at A19, ¶ 4; A20, ¶ 5. Specifically, Cornell declared that:

At one point during the audit survey, Mr. Garvin asked me whether [the Academy] had been selected for audit based upon allegations of wrongdoing. I again reiterated that [the Academy] had been selected for audit based on its size and not based on any allegations of wrongdoing. This statement was true and correct. Mr. Garvin did not ask me whether there were any allegations of wrongdoing by [the Academy] or whether there was any pending investigation; had he asked me these questions I would have referred him to the Regional Inspector General for Investigations as I had been instructed.

*Id.* at A19–A20, ¶ 5; *see also id.* at A19, ¶ 4 (to similar effect as to the audit entrance conference). Cornell also never told any employee of the Academy that there were no allegations of wrongdoing by the Academy. *Id.* at A19, ¶ 4. The audit review was stopped on April 20, 1989. The IG Auditors were asked two weeks prior to the July 26, 1989, search of the Academy to participate in the execution of the search.[19]

The allegations of audit abuse presented by the Academy, even if accepted as true, simply do not carry their burden. Assuming that the Academy was told that the audit was routine, one purpose of any routine IG audit is to determine whether there is any impropriety or wrongdoing by the audited party. Indeed, such is the mission of the IG who is charged with the responsibility of rooting out fraud and abuses by participants in federal programs. As a result of the IG audit, regardless of the initial motivation behind the audit, the omni-

**17.** The Office of Regional Inspector General did give Monaghan three categories of documents. Two of these were in the public record. These were Academy catalogues and a copy of a complaint that had been filed in court by the State of Ohio against the Academy. The third category was student complaints contained in the file maintained by the Department's Division of Eligibility and Certification which the Regional Inspector General had borrowed and which would have been otherwise available to Monaghan. D.I. 12 at A9.

**18.** Garvin has declared that: "Periodically throughout the audit, IG *auditors* have assured the Academy that there are no allegations of

wrongdoing by the school...." D.I. 8B at A200087, ¶ 17 (emphasis added). There is no evidence of who these other auditors were. Garvin also declared that at the March 30, 1989, meeting with the IG auditors (Cornell, Houk, and Taeuber), "one of the IG representatives, in substance, again told us that the ... Academy was not accused of wrongdoing." D.I. 17 at A100045, ¶ 6. There is no evidence that anyone other than Cornell was asked any questions regarding the nature of the audit.

**19.** The Third Circuit has made clear that the it is not improper for the IG to issue a civil subpoena even though it may be used to develop a criminal case. *See EDN,* 884 F.2d at 742–43.

present possibility exists that information may come to light that could result in additional civil or criminal investigations and possibly formal charges. This should be no surprise to the Academy because of the IG's civil and criminal responsibilities. *See* D.I. 25 at 32. Thus, to the extent that the Academy relied on the representation that the audit was routine, it should have been expected that information obtained from such an audit could lead to a criminal investigation.

The Academy was bound by federal regulations to maintain and provide access to the very types of information sought by the IG. The Academy is a fiduciary for more than a quarter of a billion dollars in federal and federally-insured funds that it has received.[20] As a condition to receiving those funds, the Academy was contractually aware of IG audits and agreed to provide access to those records pertinent to the programs in which it participated for purposes of audit and examination. *See, e.g.,* 34 C.F.R. § 668.23.

The types of records that the IG sought to review in the March audit and which it now seeks to review pursuant to the subpoena are those that the regulations of the Secretary of Education require the Academy to keep and make available for inspection as a condition of the Academy's receipt of federal funds.[21] The Academy contractually agreed to IG audits in its program participation agreements and in its contractual agreements to abide by all of the Department's regulations, including access to records requirements, as a condition of receiving federal funds. *See* D.I. 1 Attachment C to the Horn Declaration. Thus, even assuming that the IG auditors did lead the Academy to believe that there were no allegations of wrongdoing against the Academy, those materials sought were subject to IG audit review. This does not mean that the Court will turn a blind eye to appropriate allegations of an abuse of the court's process when confronted with a petition to summarily enforce an IG subpoena. Taken together, the audit deception allegations in this case do not support the conclusion that summary enforcement would amount to an abuse of the Court's process.[22]

**20.** As a condition of receiving federal funds, the Academy takes on the obligations of a fiduciary towards the funds that it receives. *See* 34 C.F.R. § 668.82(a) ("A participating institution acts in the nature of a fiduciary in its administration of the Title IV, HEA programs"). "In the capacity of a fiduciary, the [Academy] is subject to the highest standard of care and diligence in administering the programs and in accounting to the Secretary for the funds received under [the Pell and Stafford] programs." 34 C.F.R. § 668.82(b).

**21.** The relevant regulations provide that an institution, such as the Academy, that participates in the Pell and Stafford programs, "[f]or purposes of audit and examination, ... shall give the Secretary, the Comptroller General, or their duly authorized representative [ (*i.e.,* the IG) ] access to the records required by the program and this part and to any other pertinent books, documents, papers, and records." 34 C.F.R. § 668.23(b).

The required records include:

(f)(1) In addition to the records required under the applicable program regulations and this part, for each recipient of Title IV, HEA program assistance, the institution shall establish and maintain, on a current basis, records regarding—(i) The student's admission to, and enrollment status at, the institution; (ii) The program and courses in which the student is enrolled; (iii) Whether the student is maintaining satisfactory progress in his or her course of study; (iv) Any refunds due or paid to the student, the Title IV, HEA program account(s) and the student's lender under the GSL ... programs; (v) The student's placement by the institution in a job if the institution provides a placement service and the student uses that service; (vi) The student's prior receipt of financial aid (see § 668.19); (vii) The verification of student aid application data; and (viii) Information substantiating all disclosures made to a prospective student under § 668.44(c) through (f) of this part.

(2)(i) An institution shall establish and maintain records regarding the educational qualifications of each regular student it admits, whether or not the student receives Title IV, HEA assistance, which are relevant to the institution's admissions standards.

34 C.F.R. §§ 668.23(f)(1) and (2)(i).

**22.** The Academy's reference to *S.E.C. v. ESM Government Securities, Inc.,* 645 F.2d 310 (5th Cir.1981), does not change this result. In *ESM,* the Fifth Circuit said that "[i]n holding that fraud, deceit or trickery is grounds for denying enforcement of an administrative subpoena, we exercise the well-established power of the courts to prevent abuse of process." *ESM,* 645 F.2d at 317. The court further stated that in consider-

Furthermore, even assuming that the Academy could have refused to voluntarily comply with the IG's request to conduct the audit and therefore force the IG to seek a subpoena, the result would not have been different. The fact is that the same type of information pertinent to the IG audit would have been sought by the subpoena. Indeed, it appears that all the information required to be maintained by the regulations is necessarily relevant to the IG investigation with regard to the Stafford and Pell programs. Thus, in this regard, no harm has come to the Academy by reason of the IG audit.[23]

The Academy points out that the subpoena is based, at least in part, on certain interviews of the Academy's employees on the Academy's premises in March of 1989. D.I. 16 at 11, citing to D.I. 12 at A21, ¶ 9; A24, ¶ 16. Indeed, nothing in the program participation agreement or the regulations establishes that the Academy has expressly consented to such on-site interviews of its personnel. D.I. 16 at 10.[24] One category of information that was a "product" of one of these interviews are "records concerning USA Training Academy's job placement service...." D.I. 12 at A21, ¶ 9; see also D.I. 1 at Attachment F, ¶ 5. Even if it is assumed that such information was a product of the interview, the Academy was required to "establish and maintain, on a current basis, records regarding ... (v) The student's placement by the [Academy] in a job if the institution provides a placement service and the student uses that service...." 34 C.F.R. § 668.23(f)(1)(v). As such, the IG would have had a basis for requesting such information pursuant to section 668.23(f)(1)(v). In the event that the Academy did not have such information, they could have so responded to the subpoena.

The other information allegedly a "product" of the onsite interviews are the computer files sought by the subpoena. See D.I. 12 at A23–A24, ¶¶ 4–6. The list of computer files was provided to the IG representative in March, 1989, by two employees of the Academy who were familiar with the Academy's computer system. D.I. 12 at A23, ¶ 4. These files are not student data files but rather are "descriptions of the data that are contained in eight student

---

ing each case on its facts, the court must "evaluate the seriousness of the violation under all the circumstances, including the government's good faith and the degree of harm imposed by the unlawful conduct." *Id., quoting United States v. Bank of Moulton,* 614 F.2d 1063, 1065 (5th Cir. 1980). In the instant matter, this court merely concluded that the audit deception allegations do not carry the burden on the abuse of process issue. While the IG's responses to the Academy's questions as to the nature of the IG audit may have been guarded, they were unequivocal as to the specific questions asked. If for no other reason, the responses could not be fraudulent because the Academy must be charged with the knowledge that even a routine IG audit could lead to civil or criminal investigations.

23. Interestingly, the Academy, at oral argument indicated that if all the IG personnel who participated in the March audit and the July search and their files were "walled off" and new IG personnel were put on this case, then the audit of the Academy could proceed. D.I. 25 at 27. If, in fact, that were to occur, there appears to be no basis for the Academy to resist a subsequent subpoena that would issue because the IG could pursue categories of information required to be maintained pursuant to regulations. Sure-

ly, all such information would be pertinent to the IG's investigation.

24. However, a proposed amendment to 34 C.F.R. § 668.23(b) suggests that this was the preexisting practice, at least as far as the Government understood it, and the amendment seeks to clarify that practice. The proposed regulation provided as follows:

The Secretary proposes to amend paragraph (b) of [section 668.23, Audits, records and examination] to *clarify* that a participating institution must give the Secretary, the Inspector General of the Department of Education, and the Comptroller General, or their duly authorized representatives timely access to the institution's financial aid-related records and access to institutional personnel involved with the administration of Title IV, HEA program funds. Recently, some institutions have denied the Office of Inspector General (OIG) the right to copy documents related to their participation in the Title IV, HEA programs. Some institutions have also inordinately delayed providing records to the OIG. This proposal *clarifies* the Secretary's *existing policy,* which appears to have been subject to misinterpretation by some institutions.

54 Fed.Reg. 11356 (March 17, 1989) copied at D.I. 16 at A3 (emphasis added).

data files." *Id.* at A24–A25, ¶ 7.[25] "Mr. Murray[, one of the Academy's computer employees,] represented to [the IG auditors] during the [March] audit survey that the eight student data files so described contain information relevant to our audit. The subpoena requests the underlying data files." *Id.* Neither of the computer employees of the Academy who provided this information dispute this. *See, e.g.*, D.I. 8A at A100004; D.I. 8C at A200523. If the Academy's computer employees had not disclosed the existence of such files to the IG auditors in March of 1989, there appears to be no reason why the IG could not have made a request for examination of such files anyway. Additionally, the IG could have requested such categories of information in a subpoena even if they had not learned of the specific file names from the Academy's employees. While the IG may not have known the specific names of such files, the information in those files, if relevant, would have had to have been provided barring some other unknown impropriety. Indeed, the Academy had traditionally taken the posture that the IG auditors were welcome to examine the computer

files provided such examination was done so on the Academy's premises. The problems only arose when the IG requested that copies of such files be made so that the IG could conduct its examination on its own computers.[26]

The Academy has also alleged that the computer files contain proprietary and confidential information precluding the disclosure of such files to the IG. D.I. 11 at v. These assertions are without merit. Even if some of the information contained in the files is confidential, the General Education Provisions Act provides that the Secretary of the Department and the Department IG are not precluded from accessing such confidential information. *See* 20 U.S.C. §§ 1232g(b)(1)(C) and (D). *See also id.* at § 1232g(b)(3).[27] Furthermore, assuming that the computer files do contain proprietary trade secret information, there are prohibitions against the production of such information to competitors of the Academy.[28] *See, e.g.*, 5 U.S.C. § 552(b)(4) (Freedom of Information Act disclosure provisions do not apply to matters that are "trade secrets and commercial or financial

---

**25.** *See* D.I. 12 at A23–A27 for the reasons why copies of these files are needed by the IG for review with the IG's own computer system.

**26.** The IG's computer analysts wanted to perform reliability assessments and statistical surveys of the data on the computer files to enable them to choose an appropriate universe of student files for an intensive audit. The analysts also requested copies of the Academy's computer programs that are supposed to be designed to test the accuracy and reliability of the data entered into the computer system in order to insure the integrity of the federal funds received by the Academy. The copies of the eight computer files sought by the IG are necessary because the Academy uses a Data General computer system that requires custom written programs and the IG auditors use an Audit Analyzer program that runs only on IBM mainframes. Furthermore, while the Academy offered the assistance of its computer programmers to devise programs for the IG auditors to use, that would necessarily compromise the confidentiality of the auditors work. *See* D.I. 12 at 10–12. These reasons satisfy the Court that copies of the computer files are necessary for the IG to properly conduct its examination. Conditions may be necessary, however, to insure the integrity of the files and their continued availability to the Academy.

**27.** Section 1232g(b)(3) provides that:

Nothing contained in this section[, 20 U.S.C. § 1232g Family educational and privacy rights] shall preclude authorized representatives of ... (B) the Secretary [of the Department of Education], ... from having access to student or other records which may be necessary in connection with audit and evaluation of Federally-supported program, or in connection with the enforcement of Federal legal requirements which relate to such programs: *Provided,* that except when collection of personally identifiable information is specifically authorized by Federal law, any data collected by such officials shall be protected in a manner which will not permit the personal identification of students and their parents by other than those officials, and such personally identifiable data shall be destroyed when no longer needed for such audit, evaluation, and enforcement of Federal legal requirements. 20 U.S.C. § 1232g(b)(3).

**28.** The Academy has asserted that it has developed the computer programs and that there are no such programs available to the general public for the types of processes performed by those programs. This would apparently make such programs highly desirable to the Academy's competitors.

information obtained from a person and privileged or confidential"); 18 U.S.C. § 1905 (making it a crime for a federal employee to publicly disclose trade secrets obtained in the course of his duties).[29]

The Academy's allegations of audit deception based on the circumstances of this case do not amount to a requisite showing that it would abuse the Court's process to summarily enforce the subpoena.

### (ii) *Search and Seizure*

■ The Academy next asserts that the IG subpoena is the product of an unconstitutional search and seizure executed in retaliation for the Academy's refusal to accede to the IG's demands to turn over the school's databases. The Academy argues that all four of the persons to whom the subpoena is made returnable participated in the July search of the Academy.[30] Moreover, the Academy argues that the bulk of the materials seized and searched during the July search of the Academy are among the records called for by the IG subpoena and that the IG may not now subpoena the Academy for documents based on information gained as a result of the allegedly illegal July search. D.I. 11 at 22. The Academy argues that enforcement of the subpoena would result in a violation of the Academy's rights under the fourth amendment and the due process clause and abuse the judicial process of this Court. D.I. 11 at 27.

The IG responds to this by arguing that the legality of the July search is irrelevant to this proceeding. D.I. 12 at 26. This is so, argues the IG, for three reasons. First, relying on the Supreme Court's decision in *Zap v. United States*, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), the IG argues it would have been entitled to enter the Academy's premises without a warrant and any knowledge gained in the course of such an inspection could later be lawfully used. *Id.*

at 27–28. This argument is based on the federal program participation contracts between the Academy and the Department. Second, the IG argues that even if the alleged defects in the warrant were relevant in this proceeding, the subpoena consists almost entirely of a list of routine documents that the Academy is required by regulation to maintain. *Id.* at 27, 29. Furthermore, the IG argues that nothing in the subpoena is in any way based upon information or documents obtained during the search. *Id.* Thirdly, the IG argues that even if the subpoena did include evidence obtained during the search, the exclusionary rule is not applicable to this proceeding and the subpoena could not be quashed. *Id.* at 27–28, 30–31.

In *Zap*, the petitioner was convicted of violating a federal criminal statute against defrauding the Government. The petitioner had entered into contracts with the Navy Department involving certain experimental work on airplane wings and to conduct test flights. The contract provided that: "The accounts and records of the contractor shall be open at all times to the Government and its representatives, and such statements and returns relative to cost shall be made as may be directed by the Government." *Zap*, 328 U.S. at 627, 66 S.Ct. at 1279. Furthermore, a statute provided for the inspection and audit of contractors, such as the petitioner. *Id.* at 626–27, 66 S.Ct. at 1278. Agents of the FBI, acting under the auspices and by the authority of an accountant and a cost inspector of the Navy Department, audited the petitioner's books and records at his place of business. *Id.* at 627, 66 S.Ct. at 1278. The petitioner was absent during part of the audit but his employees cooperated with the agents and supplied them with the books and records. *Id.* While the petitioner protested to this when he returned from his absence, the agents continued the ex-

---

29. Furthermore, during the oral argument of this matter, the attorney for the IG represented that the IG would make every effort to protect the secrecy of the computer programs. The Court's suggestion of a confidentiality order was also not opposed.

30. They also allege that two of these representatives from the IG had supervisory functions during the search and that one of them, Steven Gelfand, made the decision to conduct the search. Gelfand has declared that the decision to seek a search warrant was a joint decision made by the U.S. Attorney's Office in Delaware, the FBI and the OIG. *See* D.I. 12 at A4, ¶ 7.

amination with the assistance of the petitioner's employees. *Id.* One of the agents requested a check. *Id.* This check was eventually admitted at trial as evidence of the petitioner's fraud on the Navy Department. *Id* at 628, 66 S.Ct. at 1279. The sole issue before the Supreme Court was the propriety of the District Court's allowing the check to be admitted into evidence. *Id.*

The Supreme Court began its analysis of the issue by noting that the fourth and fifth amendment rights regarding searches and seizures can be waived. *Id.* The Court found that the Government could utilize any knowledge gained from the inspection. *Id.* at 629, 66 S.Ct. at 1279.[31] The Court reached this conclusion based on the agreement between the petitioner and the Government to allow the inspection. *Id.* Furthermore, the Court reached this conclusion even assuming that the taking of the check was unlawful. *Id.* During the inspection, photostats or copies could have been made and could have subsequently been introduced into evidence without the originals. *Id.* The court concluded that it was within the sound discretion of the trial court to admit the check into evidence. *Id.* at 630, 66 S.Ct. at 1280. The *Zap* holding has since been recharacterized by the Supreme Court as an application of the consent exception to the fourth amendment warrant requirement. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). *See also First Alabama Bank of Montgomery v. Donovan,* 692 F.2d 714, 720 (11th Cir.1982).

As previously discussed, the relevant regulations require the Academy to give access to certain of its records pertaining to the federal loan and grant programs to the Department's IG for purposes of audit and examination. *See, e.g., supra* at 227–28, 231. Because of these regulations and the Academy's agreement to be bound by such regulations, the Academy, in effect, waived any reasonable expectation that it may have otherwise had to keep these records private from the Department and its authorized agents for purposes of audit and examination and discovering fraud and abuse in the Academy's participation in the Stafford and Pell programs. This is not the same as saying the Academy waived its rights to be free from unconstitutional searches and seizures. *First Alabama Bank,* 692 F.2d at 719. The Court need not go that far to resolve this matter. Rather, the issue involved here is whether there is a sufficient basis to conclude from all the circumstances that the Academy had no reasonable expectation of privacy in the documents in question. The conclusion is, obviously, they did not. It would not abuse the Court's process to summarily enforce the IG subpoena in light of the July search.[32]

---

**31.** The Court reasoned that:

> [W]hen petitioner, in order to obtain the Government's business, specifically agreed to permit inspection of his accounts and records, he voluntarily waived such claim to privacy which he otherwise might have had as respects business documents related to those contracts. Whatever may be the limits of that power of inspection, they were not transcended here.... [T]he inspection was made during regular hours at the place of business. No force or threat of force was employed. Indeed, the inspection was made with the full cooperation of petitioner's staff....

*Zap,* 328 U.S. at 628, 66 S.Ct. at 1279.

> The agents ... were lawfully on the premises. They obtained by lawful means access to the documents. That much at least was granted by the contractual agreement for inspection. They were not trespassers. They did not obtain access by force, fraud, or trickery. Thus the knowledge they acquired concerning petitioner's conduct under the contract with the Government was lawfully obtained. Neither the Fourth nor Fifth Amendment would preclude the agents from testifying at the trial concerning the facts about which they had lawfully obtained knowledge.... Even though it be assumed in passing that the taking of the check was unlawful, that would not make inadmissible in evidence the knowledge which had been legally obtained.... The agreement to allow an inspection carried consequences at least so great.

*Id.* at 629, 66 S.Ct. at 1279–80.

**32.** It is interesting to note that had the IG subpoenaed the Academy for the production of the materials it now seeks, immediately upon the Academy's failure to comply with the IG's request for the data files (*i.e.,* prior to the July search) this issue would never have presented itself. In that case, it appears that the Academy would have had to contest summary enforcement on grounds this Court has rejected in this opinion (*i.e.,* burdensomeness, indefiniteness, audit deception).

Here, the Academy is concerned that Gelfand, the Regional IG for Investigations, may have utilized some knowledge that he may have gained during his participation in the July search in his drafting of the subpoena.[33] The Academy has, however, failed to offer any evidence that any item in the subpoena was derived from the July search. Furthermore, the IG has already stated in its brief that the "documents being sought by the subpoena ... are the documents that USA Training is required by law and contract to keep and make available to the Secretary and the IG pursuant to 34 C.F.R. § 668.23(f)(1)." D.I. 12 at 35.[34] Limited in this way it appears that the IG could have drafted the subpoena to include all of those records of the types listed in the regulations at any time before the search and certainly by deduction any time thereafter. The Academy, therefore, has failed to show that any of the items sought by the subpoena were in any way derived from Gelfand's actions during the July search. The same is true even if Gelfand did, in fact, obtain some unspecified knowledge from the July search and used it in drafting the subpoena. The IG was entitled to access such information and had a basis to request such information as a result of contract and regulation.

The Academy's argument that the IG has completely failed to meet its burden of proving that the Academy freely and voluntarily consented to the search and "surrendered its constitutional, statutory and regulatory rights to refuse voluntary compliance with the IG's inspection requests, and to insist instead on legal process to enforce those rights", D.I. 16 at 7, misses the point. With the argument, the Academy is clouding the issues presently before this Court. It is not that the contractual and regulatory access obligations of the Academy serve as a justification for the July search. Rather, those obligations are relied on to enforce the subpoena before this Court. That subpoena was issued by the IG pursuant to the IG Act in part to determine whether the Academy was fulfilling its contractual and regulatory obligations and to obtain access to the information in the hands of the Academy relevant to that mission. While the Academy argues that it had a right to require the IG to resort to legal processes (*i.e.*, a valid warrant or an IG subpoena) to enforce the access obligations on the Academy, the Academy certainly cannot seriously contend that the Department IG does not have a right to access to the federal programs information for IG Act purposes.

The Academy argues that four of the "agents" before whom the subpoena is made returnable actively participated in the July search. D.I. 11 at 20–21. These individuals are: Steven J. Gelfand, the Regional IG for Investigations; Special Agent David A. Klein; James Cornell, Assistant Regional IG for Audit; and Special Agent Richard Leaf. *Id.* The Academy also asserts that "the bulk of the materials seized

---

**33.** The Academy points out that "Gelfand does *not* state ... what documents he reviewed, or was told about, *during the search itself.*" D.I. 17 at 17 (emphasis in original). The Academy further points out that in the FBI briefing booklet left behind after the search, Gelfand was a member of the search team that searched the Personnel Building Lessons Department and that certain portions of the subpoena "are certainly geared ... directly into 'lessons' information." *Id.*

**34.** Gelfand has stated that the documents sought in the subpoena are general categories of documents that are routinely kept by schools that participate in the Stafford and Pell programs. D.I. 12 at A2, ¶ 3.
 Nothing in the subpoena is unique to USA Training Academy other than our request for "C" cards and for eight computer data files. The existence of the "C" cards were described to me by a witness prior to the date of the search. The computer data files are the same files that were requested by the Regional Inspector General for Audit by letter to Paul L. Teeven dated April 4, 1989, more than three months prior to the search; I obtained the list of these files from two employees of the Advanced Techniques Branch of Audit Services who had participated in the audit survey. In drafting the subpoena I also consulted with James Cornell, the supervisory auditor present at USA Training during the audit survey. Mr. Cornell gave me information concerning job placement service at USA Training Academy, which I used to draft paragraph 5 of the subpoena.
*Id.* Additionally, Gelfand stated that he did not consult with David Klein in drafting the subpoena. *Id.*, ¶ 4.

and searched ... are among the records called for by the IG's subpoena." *Id.* at 21. The Academy places special emphasis on the computer records sought by the subpoena which, the Academy argues, were a major part of the records seized in the July search. *Id.*

Gelfand has affirmatively stated that "[n]othing in the subpoena is based in any way upon information gathered in the course of the search." D.I. 12 at A2, ¶ 2. Additionally, the IG has supplied other evidence that satisfies the Court that even if there were items sought by the subpoena that were not already accessible to the IG by contract and regulation, such items did not derive from the search. For example, two items in the subpoena that are "unique" to the Academy, the "C" cards and the eight computer data files, derive from information predating the July search. *See* D.I. 12 at A–2, ¶ 3; *see also, supra* at 232–34 (discussing the computer files).

The "C" cards are "cards on which the Academy's counselors note their telephone contacts with students or their attempts to contact students. A counselor may note on the card if a student says he or she has completed some lessons and will mail them in but the Academy does not consider notes like this to be records of lessons completed." D.I. 8A at 100002–A100003, ¶ 10. Gelfand has declared that "the existence of 'C' cards were described to me by a witness prior to the date of the search." D.I. 12 at A2, ¶ 3. Furthermore, Gelfand was "informed by a witness" that "answers to lessons" were recorded from telephone calls by Academy counselors. *Id.* at A6, ¶ 12d. The lessons were documented on the "C" cards as well as on the Academy's computer. *Id.* Gelfand further stated that he was "informed by witnesses that [Academy] employees had been directed to remove the C cards and to conceal them from IG auditors." These "C" cards could lead to relevant information as to whether "the student is maintaining satisfactory progress in his or her course of study." 34 C.F.R. § 668.23(f)(1)(iii). As such, these records are within the categories of materials maintained by the Academy as part of its obligation of participation in the federal programs. Indeed, the Academy has conceded that counselors "may note on the cards if a student says he or she has completed some lessons and will mail them in...." D.I. 8A at A100002–A100003, ¶ 10. As such, if the IG had requested records pursuant to 34 C.F.R. § 668.23(f)(1)(iii), the Academy ultimately would have had to produce the C cards.

The Academy relies on *United States v. Bank of Commerce*, 405 F.2d 931 (3rd Cir. 1969), in support of its position that it can maintain a subpoena abuse of process argument based on a fourth amendment violation. In *Bank of Commerce*, the court stated the "were the [IRS] summonses directed at the very records seized in violation of appellant's Fourth Amendment rights ... the appellant's claim would be entitled to consideration before enforcement were ordered...." *Bank of Commerce*, 405 F.2d at 935. The court held "that the district court should hear and determine appellant's Fourth Amendment claim and thus assure itself that its process will not be abused." *Id.; see also Gluck v. United States*, 771 F.2d 750, 756–57 (3rd Cir.1985).

This Court has not precluded consideration of the Academy's position that, in an appropriate case, that argument may be appropriate. This Court has found, however, that this is not such a case because there is no evidence that any of the information sought in the subpoena derived from any assumed fourth amendment violation. Merely arguing or assuming an abuse of process argument without adequate factual support to rebut the IG's sworn declarations does not present a sufficient basis upon which the Court should deny summary enforcement. Furthermore, as previously discussed, the IG has presented adequate support that the subpoena derived not from the claimed fourth amendment violation but rather from preexisting and independently derived knowledge.

The Court is concerned with what appears to be an attempt to turn this summary enforcement proceeding into a quasi-

criminal suppression hearing. Followed to an extreme, the Academy's arguments could result in forever foreclosing the IG's civil investigation of the allegations of wrongdoing against the Academy. The IG Act simply does not contemplate this result and the Court must be vigilant to ensure that the OIG is not unnecessarily hampered in its legitimate attempt to ferret out instances of fraud and other wrongdoing.

#### (iii) *Grand Jury Matter*

■ The Academy argues that summary enforcement of the subpoena would violate the grand jury secrecy rules. The argument is that Agent Klein is one of those to whom the subpoenaed materials are returnable and he is also assisting the U.S. Attorney's Office in conducting the related grand jury investigation. D.I. 11 at 28.[35] "This dual agency by Agent Klein[, argues the Academy,] violates Fed.R.Crim.P. 6(e), and the rule of grand jury secrecy." *Id.* The Academy is concerned that Agent Klein would utilize grand jury information in analyzing and evaluating the materials received under the IG subpoena. *Id.* at 30.

Klein was named as a return agent for the subpoena prior to his being assigned to the grand jury investigation. D.I. 12 at A2, ¶ 4. In its arguments on this matter, the IG has stated that "in the event that USA Training produces records Mr. Klein will not review them, in order to keep the grand jury and administrative processes separate." D.I. 12 at 32. Furthermore, upon his assignment to the grand jury investigation, Mr. Klein will no longer participate in any civil or administrative investigation in this matter. D.I. 12 at A2, ¶ 4. The result is that the Academy's argument is now moot.

#### (c) Discovery and Evidentiary Hearing

■ The Academy asserts that the record now reflects nonfrivolous legal defenses, *see Wheeling–Pittsburgh*, 648 F.2d at 128, concerning which there are factual disputes to be resolved. D.I. 17 at 3. Accordingly, the Academy argues it is entitled to discovery and an evidentiary hearing. *See, e.g.,* D.I. 10 at 8. In support, the Academy asserts that there is a record conflict as to whether the IG represented to the Academy that there were no allegations of wrongdoing by the Academy; and the Academy was misled by the IG's representations regarding no allegations of wrongdoing which were allegedly material to the Academy and relied on by the Academy. D.I. 17 at 3–4. The Academy also points out the undisputed fact that the IG subpoena was based, at least in part, on the March, 1989, audit and that there is a possibility that the subpoena was based, in part, on the July search necessitating cross-examination of the IG's denial of taint. *Id.* The Academy's position is that "even if the IG's 'purpose' in his audit and his search was 'civil', his fraudulent conduct in connection with the audit and his admitted participation in an unconstitutional search and seizure constitute valid 'abuse of process' defenses to enforcement of a subpoena which is the product of such wrongful agency conduct." D.I. 17 at 7.

This Court's preceding analysis mandates that the Academy's request for discovery and an evidentiary hearing must be rejected. The IG has limited the subpoena to those matters that the Academy was required to maintain by contract and regulation. As previously discussed, the information obtained during the March, 1989, audit was information that the IG was already entitled to access and would have eventually been subject to IG audit and examination review. The same can be said of the July search. Furthermore, the Academy has not shown any tainted material requested by the Academy resulting from the July search.

The Academy's reliance on *United States v. Serubo*, 604 F.2d 807 (3rd Cir. 1979), is misplaced. In that case, the court was concerned that the IRS was being used improperly as an " 'information gathering agency for other departments,' in violation of the *LaSalle* standard." *Serubo*, 604

---

**35.** The Academy also argues that Agent Klein may take a "central role in the investigation." D.I. 11 at 34.

F.2d at 813. As to the thirteen challenged IRS subpoenas, the Circuit Court said that "individual determinations of non-criminal purpose were clearly required." *Id.* The District Court had "assumed that there was a *Donaldson–LaSalle* violation, but accepted the agent's representation of absence of taint without affording the defendants access to the wherewithal to conduct an effective crossexamination." *Id.* Because the government had the burden of showing a " 'taint-free' basis for the evidence it relied on in the criminal prosecution", the Circuit Court remanded the case to allow the defendant to conduct limited discovery. *Id.*

In *Serubo,* discovery was afforded to the defendants because *LaSalle* and its progeny (*see, e.g., United States v. Genser,* 582 F.2d 292 (3rd Cir.1978) (*"Genser I "*), and *United States v. Genser,* 595 F.2d 146 (3rd Cir.1979) (*"Genser II "*)), set forth that the IRS could not issue a section 7602 summons after the IRS agents recommended criminal prosecution to the Justice Department; where there was an institutional decision by the IRS to refer the matter to the Justice Department but delayed in so doing to gather additional evidence for prosecution; or when the IRS was used as a mere evidence gathering agency for other departments. *Serubo,* 604 F.2d at 811. *Genser II* had held that if any individual IRS summons had "issued solely for a criminal purpose, the fruits of that summons would have to be suppressed, even in the face of an overwhelmingly civil purpose of the investigation as a whole." *Genser II,* 595 F.2d at 150. As to the thirteen summonses in *Serubo,* the IRS was at the time of their issuance working under the supervision of a Justice Department Strike Force in an ongoing criminal investigation. *Serubo,* 604 F.2d at 813. Hence, there was a concern that the IRS was being used as an information gatherer for the Justice Department. *Id.* For each of these thirteen subpoenae, then, an individual determination of non-criminal purpose was required. *Id.* Discovery was then ordered because the government had only submitted the testimony of an IRS agent that none of the information from these subpoenae was used by the grand jury or as a lead to any information which would be used at the criminal trial. *Id.* This failed to meet the government's *Genser II* burden of showing a "taint-free" basis for the evidence it relied on in the criminal prosecution. *Id.* When examined in this way, it is clear that *Serubo* is simply not applicable to the instant matter.

The basis relied upon in *Serubo* to show that discovery is required applied to the situation presented by a section 7602 IRS subpoena prior to the adoption of the TEFRA bright-line rule previously discussed. There is no indication that a similar standard is applicable to this case. Furthermore, on the record before the Court in this case, the OIG's various declarations cannot be said to be unsupported conclusions. There is no prohibition on the IG that was similar to the section 7602 prohibition on the IRS as interpreted by *LaSalle.* There was no fraud by the IG during the course of the March, 1989, audit. Furthermore, the information sought by the subpoena comprises information to which the IG was either contractually entitled, is contained in the regulations and required to be maintained or had already discovered prior to the July search. As such, the Academy's request for discovery and an evidentiary hearing must be denied.

### CONCLUSION

The IG's petition for summary enforcement of its subpoena is granted. The Academy's motion for discovery and an evidentiary hearing is denied. In addition, the issue of who will bear the expense of copying the requested information should first be left to the parties to resolve informally before the Court will intervene, if and when that becomes necessary.